**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ST. CHARLES HOSPITAL<br>300 First Capitol Drive<br>Saint Charles, MO 63301 | Case No. ___26-1654___ |
| | |
| SSM HEALTH DEPAUL HOSPITAL – ST. LOUIS<br>12303 DePaul Drive<br>Bridgeton, MO 63044 | COMPLAINT |

ST. CHARLES HOSPITAL
300 First Capitol Drive
Saint Charles, MO 63301

SSM HEALTH DEPAUL HOSPITAL – ST. LOUIS
12303 DePaul Drive
Bridgeton, MO 63044

UT HEALTH EAST TEXAS TYLER REGIONAL HOSPITAL
1000 South Beckham Ave
Tyler, TX 75701

UT HEALTH EAST TEXAS ATHENS HOSPITAL
2000 South Palestine Street
Athens, TX 75751

GOOD SAMARITAN HOSPITAL MEDICAL CENTER
1225 Wilshire Blvd
Los Angeles, CA 90017

TRINITY REGIONAL MEDICAL CENTER
1200 Pleasant Street
Des Moines, IA 50309

GOOD SAMARITAN HOSPITAL OF SUFFERN
255 Lafayette Avenue
Suffern, NY 10901

HEALTH ALLIANCE HOSPITAL – BROADWAY CAMPUS
396 Broadway
Kingston, NY 12401

HEALTH ALLIANCE HOSPITAL MARY'S AVENUE CAMPUS
105 Mary's Avenue
Kingston, NY 12401

1

IOWA LUTHERAN HOSPITAL
700 East University Avenue
Des Moines, IA 50316

FINLEY HOSPITAL
350 North Grandview Avenue
Dubuque, IA 52001

TRINITY ROCK ISLAND
2701 17th Street
Rock Island, IL 61201

ST. LUKE'S REGIONAL MEDICAL CENTER
2720 Stone Park Blvd
Sioux City, IA 51104

LONG ISLAND COLLEGE HOSPITAL
339 Hicks Street
Brooklyn, NY 11201

LENOX HILL HOSPITAL
100 East 77th Street
New York, NY 10075

PROVIDENCE HOLY CROSS MEDICAL CENTER
15031 Rinaldi Street
Mission Hills, CA 91345

CORONA REGIONAL MEDICAL CENTER
800 South Main Street
Corona, CA 92882

DAMERON HOSPITAL
525 West Acacia Street
Stockton, CA 95203

MARIAN    REGIONAL    MEDICAL    CENTER,
ARROYO GRANDE
1400 East Church Street
Santa Maria, CA 93454

MILLCREEK COMMUNITY HOSPITAL
1325 East West River Road
Shawnee, OK 74804

2

BEEBEE MEDICAL CENTER, INC.
424 Savannah Road
Lewes, DE 19958

TUCSON MEDICAL CENTER
5301 East Grant Road
Tucson, AZ 85712

SSM HEALTH SAINT JOSEPH HOSPITAL –
SAINT CHARLES
300 First Capitol Drive
Saint Charles, MO 63301

SSM HEALTH SAINT MARY'S HOSPITAL –
SAINT LOUIS
6420 Clayton Road
Saint Louis, MO 63117

SSM HEALTH SAINT JOSEPH HOSPITAL – WEST
100 Medical Plaza
Lake Saint Louis, MO 63367

SSM ST. JOSEPH HEALTH CENTER
525 South Couch Avenue
Kirkwood, MO 63122

MERCY MEDICAL CENTER
3660 Dekalb Avenue
Bronx, NY 10467

BON SECOURS COMMUNITY HOSPITAL
160 East Main Street
Port Jervis, NY 12771

UNITYPOINT HEALTH – DES MOINES IOWA
METHODIST MEDICAL CENTER
1200 Pleasant Street
Des Moines, IA 50309

ST. LUKE'S HOSPITAL
1026 A Avenue Northeast
Cedar Rapids, IA  52402

ALLEN HOSPITAL
1825 Logan Avenue
Waterloo, IA  50703

TRINITY-BETTENDORF
4480 53rd Avenue
Bettendorf, IA 52722

EAST JEFFERSON GENERAL HOSPITAL
4200 Houma Blvd
Metairie, LA 70006

          Plaintiffs,

   v.

ROBERT F. KENNEDY, JR., Secretary,
United States Department of Health and
Human Services
200 Independence Avenue S.W.
Washington, D.C. 20201

          Defendant.

## COMPLAINT FOR JUDICIAL REVIEW AND DECLARATORY RELIEF UNDER THE MEDICARE ACT AND ADMINISTRATIVE PROCEDURES ACT

1.     This case involves the legal question whether Defendant Secretary, Health and Human Services ("HHS") via its agency the Centers for Medicare & Medicaid Services ("CMS") can validly enact a retroactive rule, to negate more than 30 years of reimbursement policy and legal case precedence, to the detriment of hospitals who serve a disproportionate share of indigent acute care patients. Three courts (including the U.S. Supreme Court) have already held that CMS cannot validly change its policy until *after* the effective date of formal rulemaking. After attempting to change its policy three different times since 2004 without rulemaking, CMS finally engaged in formal rulemaking to change its policy, twice: first, CMS enacted a prospective rule changing its policy for 2014 forward (which is not the subject of this action), and second, CMS purported to enact a Final Rule to be retroactive for the entire thirty years that three courts had already decided must be governed by the previous CMS policy dating back to the 1990's. That

4

second rule, CMS Rule 1739-F, 88 Fed. Reg. 37772 (June 9, 2023) (herein the "2023 Retroactive Rule") is at the heart of this action.

2.      The 2023 Retroactive Rule that CMS decided to enact dramatically and improperly reduces Medicare  reimbursement to hospitals that serve a disproportionate share of poor patients, by counting inpatient days attributable to Medicaid-eligible patients enrolled in Medicare HMO plans, Medicare Advantage Plus, or Medicare Part C plans (collectively "Part C Days") in the Medicare/SSI Fraction rather than the Medicaid percentage,[1] when determining the Plaintiffs' operating and capital DSH payments.

3.      Historically, CMS did not include Part C days in the Medicare/SSI fraction, construing those patient days as not entitled to benefits under Medicare Part A,[2] until 2004, when CMS suddenly and sharply reversed course without formal rulemaking and began putting the Part C days in the Medicare/SSI fraction.   Three courts thereafter said that such a policy change, without formal rulemaking, violated the Administrative Procedure Act ("APA").   Thereafter, CMS attempted to change the policy again, and two more Court cases held repeatedly, and the Plaintiff

---

[1] The Medicare statute provides for an additional payment to hospitals that serve a disproportionate share of low-income patients, known as the Medicare DSH payment.  The DSH payment is calculated based on a formula that includes, among other factors, a hospital's Medicaid fraction and its Medicare/SSI fraction.  The Medicaid fraction consists of "the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX [Medicaid], but who were not *entitled* to benefits under part A" divided by "the total number of the hospital's patient days for such period."  42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added).

The Medicare/SSI fraction consists of "the number of such hospital's patient days for such period which were made up of patients who (for such days) were *entitled* to benefits under part A of this title and were entitled to supplemental security income benefits" divided by "the number of such hospital's patient days for such period which were made up of patients who (for such days) were *entitled* to benefits under part A of this title."  42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) (emphasis added).

[2] At that time, CMS explained its position, which was correct:  "…once a beneficiary elects Medicare Part C, those patient days attributable to the beneficiary should not be included in the Medicare fraction of the DSH patient percentage. These patient days should be included in the count of total patient days in the Medicaid fraction (the denominator), and the patient's days for the M+C beneficiary who is also eligible for Medicaid would be included in the numerator of the Medicaid fraction .  (68 Fed. Reg. 27154, 27208 (May 19, 2003))

contends here, that CMS cannot add Part C days into the Medicare/SSI fraction retroactively, but rather only AFTER formal rulemaking.

4.    Almost twenty years later, CMS promulgated the 2023 Retroactive Rule, retroactively covering more than thirty years, to exclude Part C days in the Medicaid fraction from 1986 through September 30, 2013.  This is improper. These days should have been added to the Medicaid percentage instead.

5.    The Plaintiffs further allege that CMS's 2023 Retroactive Rule, which included Part C days in the Medicare/SSI fraction for fiscal years 1986-2014, was promulgated in violation of the APA and is therefore invalid. They assert that M+A, HMO or Part C Day patients are not "entitled to benefits under Part A" and should be excluded from the Medicare fraction and included in the Medicaid fraction.

6.    Plaintiffs allege that this 2023 Retroactive Rule is invalid as it:

a)  is contrary to the language of 42 U.S.C. § 1395ww(d)(5)(F)(vi) and specifically including 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) and 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II), and

b)  provides for a "retroactive" change in CMS's policy, which is contrary to legal precedents, violates the principles of the APA, and is arbitrary and capricious.

7.    The Plaintiffs seek to invalidate the 2023 Retroactive Rule and requests that all M+A, HMO or Part C days that are Medicaid Eligible be included in the Medicaid fraction proxy and excluded from the numerator and denominator of the Medicare Fraction.

8.    Defendant's administrative review board has now certified this action for expedited judicial review under 42 U.S.C. § 1395oo(f)(1) because it determined that it is without the authority to decide the legal questions presented in this case.

9.      Since 2004, Defendant has been attempting in unlawful ways to change the calculation of the Medicare Part A, DSH payment with respect to inpatient hospital days, for patients who opted to enroll in Medicare Advantage plans under Part C of the Medicare statute. The Court of Appeals has ruled against the agency in three actions challenging the agency's repeated attempts to accomplish the change that significantly reduces Medicare DSH payments to hospitals. *See Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1, 16–17 (D.C. Cir. 2011) (finding application of the 2004 attempted rule change to prior periods impermissibly retroactive) ("*Northeast Hosp.*"); *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1105 (D.C. Cir. 2014) ("*Allina I*") (vacating the 2004 attempted rule change because it was made without formal rulemaking and not a logical outgrowth of the prior policy); *Allina Health Servs. v. Price*, 863 F.3d 937, 943–44 (D.C. Cir. 2017) (holding that the agency must undertake formal notice-and-comment rulemaking before effectuating the policy reflected in the vacated 2004 attempted rule), *aff'd sub nom. Azar v. Allina Health Servs.*, 587 U.S. 566 (2019) ("*Allina II*").

10.     Nearly 19 years after its originally promulgated the 2004 attempted rule change that was vacated in *Northeast Hosp.* and *Allina I,* and nine years since its still-intact remand decision in *Allina I*, the agency issued the purported 2023 Retroactive Rule, seeking to readopt, retroactively, the change from the still-vacated 2004 rule that was previously implemented only prospectively in 2013. The law demands an end to this two-decade-long litigation.

11.     The 2023 Retroactive Rule, which pertains to the calculation of Disproportionate Share payments from Medicare to hospitals who serve a disproportionate number of low-income patients, is invalid and void because it impermissibly provides for "retroactive" change in CMS's policy to include Medicare Part C patient days (also known as

"Medicare Advantage") in the Medicare/SSI Fraction Denominator for fiscal years between 2004 and 2014.

12.    Because the 2023 Retroactive Rule is the basis of the calculations underlying the CMS 1739-F SSI Ratio for fiscal years 2005-2014, the CMS 1739-F SSI Ratio must also fail for all the same reasons.

13.    The Secretary has long had a policy of NOT including Medicare Part C days in the denominator of the Medicare/SSI Fraction, which court have to be a policy that could not be changed until after official rulemaking and a final 2023 Retroactive Rule.  Change prior to the effective date of a 2023 Retroactive Rule is not legally permissible, especially under legal case precedent and for other reasons including those referenced below.

14.    The Secretary's policy in this regard was articulated, as late as 2004, when the Secretary admitted:

> once a beneficiary has elected to join an M+C plan, that beneficiary's benefits are no longer administered under Part A . . . once a beneficiary elects Medicare Part C, those patient days attributable to the beneficiary should not be included in the Medicare fraction of the DSH patient percentage. These patient days should be included in the count of total patient days in the Medicaid fraction (the denominator), and the patient's days for the M+C beneficiary who is also eligible for Medicaid would be included in the numerator of the Medicaid fraction. (68 Fed. Reg. 27154, 27208 (May 19, 2003)

15.    The 2023 Retroactive Rule is improper under the law and violates the rulings in all the court cases that have been decided up to this point on this issue.  Inclusion of Medicare Part C patient days in the Medicare Fraction Denominator was held to be impermissible for fiscal years prior to 2014 in *Allina I, Northeast Hosp.*, and *Allina II*, all of which held that the prior policy and practice of the Secretary—which was NOT to include Medicare Part C days in the denominator of the Medicare/SSI Fraction—could not be changed before proper rulemaking and the effective date

8

of a Final 2023 Retroactive Rule.  The Retroactive Rule is contrary to the principals and practices of the Medicare agency for many years and cannot be changed by making a new rule "retroactive" for years when there was a different established practice in place.

16.    The 2023 Retroactive Rule violates these legal case precedents and would have the Secretary proceed as though such case precedents did not happen and do not exist.  The 2023 Retroactive Rule also violates and contradicts the Secretary's commitment given in order to obtain Voluntary Remand of *Allina III*[3] and the *Allina II* Type Cases,[4] that the Secretary would be handing the Plaintiffs the "victory" they were seeking with regard to the inclusion of Part C Days in the numerator of the Medicaid Fraction.

17.    The 2023 Retroactive Rule applying the same 2004 change should be rejected because it disregards *Allina I*, *Northeast Hosp.*, and *Allina II*; is otherwise contrary to law; exceeds the agency's rulemaking authority under the Medicare statute; and is arbitrary and capricious for failing any test of reasoned decision-making. Among other infirmities, this final action misconstrues the legal effect of the vacatur of the 2004 attempted rule change in *Allina I*, 746 F.3d at 1105, which restored the pre-2004 DSH Part C standard. By excluding Part C days from the numerator of the Medicaid fraction for any patients discharged prior to October 1, 2004, and by disclaiming any pre-2004 policy or practice treating Part C days as not Part-A-entitled days, the agency also again disregards *Northeast Hosp.*, 657 F.3d at 16–17.

18.    In addition, the 2023 Retroactive Rule violates 42 U.S.C. § 1395hh(e) because neither of the narrow exceptions for retroactive rulemaking applies here given that (1) the ambiguous DSH statute does not require any specific treatment of Part C days in the DSH calculation, *see Allina I*, 746 F.3d at 1106; *Northeast Hosp.*, 657 F.3d at 13, and the DSH statute

---

[3] *Allina Health Sys. v. Burwell*, No. 1:16-cv-150 (D.D.C. Jan. 29, 2016).
[4] *In re Allina II-Type DSH Adjustment Cases*, No. 1:19-mc-190 (D.D.C. Nov. 15, 2019).

does not require a retroactive rule for the agency to comply with its obligation to make payments. and (2) the 2023 Retroactive Rule cannot be said to be in the public interest, given that it offends fundamental notions of justice, disregards the significant public interest in *advance* notice-and-comment rulemaking, and results in thousands of safety-net hospitals losing billions of dollars in funding that has been illegally withheld for years.

19.    Nor can the agency retroactively "establish," rather than "change," the Part C DSH standard under the plain language of the Medicare statute. *See* 42 U.S.C. § 1395hh(e)(1)(A). And even if there were any ambiguity as to whether the agency had the authority to engage in this rulemaking under Section 1395hh(e) (and the agency clearly lacks that authority), any such ambiguity would need to be read against retroactivity, given the well-established presumption in law against retroactivity.

20.    The 2023 Retroactive Rule conflicts with other provisions of the Medicare statute prohibiting action against Providers with respect to noncompliance with its substantive change and precluding untimely reopening and revisions of claims payment determinations. *See* 42 U.S.C. §§ 1395hh(e)(1)(C), 1395gg(c). In addition, the final action violates *Allina II* and is procedurally invalid under 42 U.S.C. § 1395hh(a)(4), which bars the agency from effectuating or applying the same policy change from the informal rule vacated in *Allina I* as a logical outgrowth failure, 746 F.3d at 1105, at least until *after* the effective date of a legally sound notice-and-comment process adopting a new rule prospectively only, *see Allina II*, 863 F.3d at 945; *Allina II*, 587 U.S. at 581–84. The 2023 Retroactive Rule further violates *Allina II* and is procedurally invalid under 42 U.S.C. § 1395hh(a)(2) because the agency again seeks to make the change "take effect" *before* affording impacted Plaintiffs the requisite notice and comment. *See* 42 U.S.C. § 1395hh(a)(2); *Allina II*, 587 U.S. at 571–80.

21.    The 2023 Retroactive Rule also contravenes the ruling in *Northeast Hosp.*, a decision in which Defendant acquiesced.  Defendant must calculate the DSH payments for hospital years 2013 and prior with Part C Days included in the Medicaid Fraction numerator.

### Expedited Judicial Review

22.    The Medicare statute authorizes the Provider Reimbursement Review Board (the "Board") to determine that it is without authority to decide a question of law or regulations relevant to a matter in controversy in an appeal before the Board and to grant the right to expedited judicial review ("EJR"). 42 U.S.C. § 1395oo(f)(1). Congress enacted the EJR provision to provide for immediate judicial review for matters where the Board lacks power to "grant the relief sought" and thereby avoid the delay inherent in "requiring providers to pursue a time-consuming and irrelevant administrative review merely to have the right to bring suit in a U.S. District Court." H.R. Rep. No. 96-1167, at 394 (1980), reprinted in 1980 U.S.C.C.A.N. 5526, 5757. Pursuant to the Secretary's regulations, the Board is bound by agency rules and rulings, like the 2023 Retroactive Rule at issue. 42 C.F.R. § 405.1867. Accordingly, the statute allows a hospital to request a Board determination as to its authority to decide a question of law or regulations and to initiate an action in this Court if the Board determines that EJR is appropriate. *See* 42 U.S.C. § 1395oo(f)(1). Plaintiff in this action requested such EJR, which was granted on January 6, 2026.

### The Presumption Against Retroactivity and the Medicare Statute's Retroactivity Provision

23.    Retroactive rulemaking is disfavored in the law, and unless provided for expressly, statutes granting administrative agencies the authority to engage in rulemaking should be construed as extending that authority prospectively only. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *Landgraf v. USI Film Prods.*, 511 U.S. 244, 245 (1994); *Republic of Austria v. Altmann,* 541 U.S. 677, 696 (2004) ("The aim of the [anti-retroactivity] presumption

11

is to avoid unnecessary post hoc changes to legal rules on which parties relied in shaping their primary conduct.").

24.    In 1988, the Supreme Court addressed retroactive rulemaking in the Medicare context, holding in *Bowen* that the agency could not exercise its rulemaking authority to issue regulations limiting Medicare reimbursement retroactively. 488 U.S. at 215. In reaching that conclusion, the Supreme Court observed that "[r]etroactivity is not favored in the law," and that "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language underlines requires this result." *Id.* at 208 (emphases added). In his concurrence, Justice Scalia explained that a rule may be invalid as arbitrary and capricious under the APA if it "makes worthless substantial past investment incurred in reliance upon the prior rule." *Id.* at 220. He explicitly rejected the Secretary's contention that "the evils generally associated with retroactivity do not apply to reasonable 'curative' rulemaking—that is, the correction of a mistake in an earlier rulemaking proceeding"—as "ha[ving] no basis in the law," and emphasized that he "would assuredly not sanction 'curative' retroactivity." *Id.* at 225. Notably, **Justice Scalia opined that permitting such retroactive rulemaking—even if supposedly "curative"—"would 'make a mockery . . . of the APA,' since 'agencies would be free to violate the rulemaking requirements of the APA with impunity if, upon invalidation of a rule, they were free to "reissue" that rule on a retroactive basis.'"** *Id.* (alteration in original) (citation omitted).

25.    Later, in 1994, the Supreme Court observed that "[t]he presumption against statutory retroactivity is founded upon elementary consideration of fairness dictating that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *Landgraf*, 511 U.S. at 245. The Court explained that "the anti-retroactivity principle finds expression in several provisions of our Constitution," including the Ex Post Facto and Due

Process Clauses as well as the prohibitions on Bills of Attainder. *See id.* at 266. The Court added that even if the "retroactive application of a new statute would vindicate its purpose more fully[,] . . . [t]hat consideration . . . is not sufficient to rebut the presumption against retroactivity" because "[s]tatutes are seldom crafted to pursue a single goal" and "[a] legislator who supported a prospective statute might reasonably oppose retroactive application of the same statute." *Id.* at 285–86.

26.    As is relevant here, in 2003, Congress enacted 42 U.S.C. § 1395hh(e)(1), which prohibits the agency from retroactively effectuating rules or policies adopting new substantive standards "unless the Secretary determines that" one of two very narrow exceptions are met, namely, when "such retroactive application is **necessary to comply with statutory requirements**," *id.* § 1395hh(e)(1)(A)(i), or where the "**failure to apply the change retroactively would be contrary to the public interest,**" *id.* § 1395hh(e)(1)(A)(ii). [emphasis added.] Neither is applicable here.

27.    Congress enacted this provision expressly to limit CMS's power to undertake retroactive rulemaking. Before this 2003 amendment, the Medicare Act was silent regarding retroactive rulemaking. Despite Supreme Court precedent imposing a presumption against retroactivity when statutes are silent, CMS continued to engage in such retroactive rulemaking at that time.  Aware that CMS was exploiting the Medicare Act's silence to make retroactive changes in substantive payment standards, Congress responded in 2003 by enacting Section 1395hh(e)(1) to "ensure that Medicare's rules are not generally applied retroactively." H.R. Rep. No. 108-74(I), at 42 (2003) 12 (Conf. Rep.); Medicare Regulatory and Contracting Reform Act of 2001, Hearing on H.R. 3391 before the House of Representatives, 107th Con. 8793 (2001) (statement of Rep. Nancy Lee Johnson) (legislative history to Medicare retroactive rulemaking provision stating that

13

the provision was intended to "prohibit[] the government from reimposing regulations retroactively" and from "changing the rules of the game and then punishing providers for noncompliance").

28. The Medicare statute also provides that "a substantive change . . . shall not become effective before the end of the 30-day period that begins on the date that the Secretary has issued or published . . . the substantive change." 42 U.S.C. § 1395hh(e)(1)(B)(i). The statute, however, permits the change to take effect before that 30-day period "if the Secretary finds that waiver of such 30-day period is necessary to comply with statutory requirements or that the application of such 30-day period is contrary to the public interest." *Id.* § 1395hh(e)(1)(B)(ii). The Medicare statute further states that "[n]o action shall be taken against a provider of services or supplier with respect to noncompliance with such a substantive change for items and services furnished before the effective date of such a change." *Id.* § 1395hh(e)(1)(C).

29. In addition, the Medicare statute and implementing regulations provide for finality of claims payment determinations by restricting the untimely reopening and revision of a claim payment determination. *See* 42 U.S.C. § 1395gg(c); 42 C.F.R. § 405.980(b). In particular, the "without fault" provision of the Medicare statute provides that, absent a showing of fault, **the agency may not recoup an alleged overpayment from a hospital more than five years after an initial payment determination was made.** *See* 42 U.S.C. § 1395gg(c). As the Medicare Financial Management Manual explains, Congress deems such recovery to be "against . . . good conscience": There are special rules that apply when an overpayment is discovered subsequent to the fifth year following the year in which notice was sent that the amount was paid. Ordinarily, the provider or beneficiary will be considered without fault unless there is evidence to the contrary. In the absence of evidence to the contrary, the [Medicare Administrative Contractor] will not recover

the determined overpayment. Medicare Financial Management Manual, CMS Pub. 100-06, ch. 3, §§ 70.3, 80, http://www.cms.gov/manuals/downloads/Fin 106c08.pdf. Initial claims payment determinations are otherwise subject to reopening for four years, but following that period, they cannot be revised in the absence of fraud or similar fault, a clerical error that was unfavorable to the beneficiary or hospital, or as necessary pursuant to other statutes and regulations governing appeals. *See* 42 C.F.R. § 405.980(b).

30.     The 2023 Retroactive Rule is also arbitrary and capricious for many reasons, including that the agency failed (1) to acknowledge, let alone explain, that the policy retroactively readopted a policy which departed from the pre-2004 rules and practice, which themselves had only been adopted prospectively in 2013; (2) to consider properly the hospitals' reliance interests in changing its pre-2004 position; and (3) to recognize the enormous adverse financial impact on hospitals of its policy change, despite asserting that it had already made hospitals' DSH payments based on the change and having represented to the Supreme Court in seeking certiorari that the impact with respect to only one of the DSH fractions was "between $3 and $4 billion for federal fiscal years ("FFY") 2005 through 2013." Once again, through the 2023 Retroactive Rule, the agency continues to deny a 2004 change in policy and practice and made one last-ditch effort to accomplish the same change in yet another substantively and procedurally improper fashion. It must be set aside to stop the agency's repeated circumvention of the law.

## **JURISDICTION AND VENUE**

31.     This action arises under the Medicare Act, Title XVII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, and the APA, 5 U.S.C. § 551 *et seq.*

32.     Jurisdiction is proper under 42 U.S.C. § 1395oo(f)(l).

33.     Venue is proper in this judicial district under 42 U.S.C. § 1395oo(f)(l).

**PARTIES**

34.     The Plaintiff Hospitals in this action and hospital fiscal years at issue are as shown on the attached **Exhibit A**, which is incorporated by reference as though set forth in full. (*See* **Exhibit A**.)

35.     The Defendant is Robert F. Kennedy, Jr., in his official capacity as Secretary of the United States Department of Health and Human Services ("Secretary"), the federal agency that administers the Medicare program. References to the Secretary herein are meant to refer to him, to his subordinates, and to his official predecessors or successors, as the context requires.

36.     CMS is the component of the Secretary's agency with responsibility for day-to-day operation and administration of the Medicare program. CMS was formerly known as the Health Care Financing Administration. References to CMS herein are meant to refer to the agency and its predecessors.

**LEGAL AND REGULATORY BACKGROUND**

**Medicare DSH Payment**

37.     Part A of the Medicare Act covers "inpatient hospital services." 42 U.S.C. § 1395d(a)(1). Since 1983, the Medicare program has paid most hospitals for the operating costs of inpatient hospital services under the prospective payment system ("PPS"). 42 U.S.C. § 1395ww(d); 42 C.F.R. Part 412. Under PPS, Medicare pays predetermined, standardized amounts per discharge, subject to certain payment adjustments. *Id.* One of the PPS payment adjustments is the DSH payment. *See* 42 U.S.C. § 1395ww(d)(5)(F); 42 C.F.R. § 412.106.

38.     A hospital that serves a disproportionate share of low-income patients is entitled to an upward percentage adjustment to the standard PPS rates per discharge. *See* 42 U.S.C. § 1395ww(d)(5)(F); *see also* 42 C.F.R. § 412.106. A hospital may qualify for a DSH adjustment

based on its "disproportionate patient percentage." 42 U.S.C. §§ 1395ww(d)(5)(F)(i)(I) and (d)(5)(F)(v); 42 C.F.R. § 412.106(c)(1). The disproportionate patient percentage determines both a hospital's qualification for the DSH payment and the amount of the payment. *See* 42 U.S.C. §§ 1395ww(d)(5)(F)(iv) and (vii)–(xiii); 42 C.F.R. § 412.106(d). The disproportionate patient percentage is defined as the sum of two fractions expressed as percentages. 42 U.S.C. § 1395ww(d)(5)(F)(vi).

39.     The first fraction that is used to compute the DSH payment is commonly known as the "Medicaid fraction." The statute defines the Medicaid fraction as: [T]he fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under [the Medicaid statute, title XIX of the Social Security Act], but who were *not entitled to benefits under part A* of [the Medicare statute, title XVIII of the Social Security Act], and the denominator of which is the total number of the hospital's patient days for such period. 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added). As reflected in the italicized language above, the numerator of the Medicaid fraction consists of days for patients who were both eligible for medical assistance under the Medicaid statute and "not entitled to benefits under part A" of the Medicare statute.

40.     The other fraction that is used to compute the DSH payment is the "Medicare part A/SSI fraction" or "SSI fraction." The statute defines this fraction as: "[T]he fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were *entitled to benefits under part A* of [the Medicare statute] and were entitled to supplemental security income benefits (excluding any State supplementation) . . . and the denominator of which is the number of such hospital's patient days

17

for such fiscal year which were made up of patients who (for such days) were *entitled to benefits under part A* of [the Medicare statute.] 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) (emphases added). As the italicized language indicates, the Medicare Part A/SSI fraction consists solely of days for patients who were "entitled to benefits under part A" of Medicare. The denominator includes all Medicare Part A days, whereas the numerator includes only those Part A days for patients who are also entitled to social security income ("SSI") benefits under title XVI of the Social Security Act. The Medicare Part A/SSI fraction is computed for each FFY by the agency and must be used to compute a hospital's DSH payment for the cost reporting period beginning in the federal fiscal year. 42 C.F.R. §§ 412.106(b)(2)–(3). A hospital may elect to have the Medicare Part A/SSI fraction recalculated based on patient days in its own cost reporting period instead of the federal fiscal year. *See id.*; *see also* 42 U.S.C. § 1395ww(d)(5)(F)(vi), (vi)(I) (requiring calculation of Medicare Part A/SSI fraction based on the cost reporting period); 51 Fed. Reg. 16,772, 16,777 (May 6, 1986) (stating that while the agency would rely on the federal fiscal year, it was "affording all hospitals the option to determine their number of patient days of those dually entitled to Medicare Part A and SSI for their own cost reporting periods").

41.     After the close of each fiscal year, a hospital is required to file a "cost report" with a Medicare Administrative Contractor designated by the agency. 42 C.F.R. §§ 413.20(b), 413.24. The cost report includes claims for DSH payments for the period. *See* Medicare Claims Processing Manual, CMS Pub. 100-04, ch. 3, § 20.3, https://www.cms.gov/regulations-andguidance/guidance/manuals/downloads/clm104c03.pdf ("[T]he [contractor] will identify hospitals that are eligible to receive the DSH adjustment and make interim payments subject to a year-end settlement based upon the hospital's DSH percentage for the cost reporting period.").

18

42.    The Medicare Administrative Contractor analyzes a hospital's cost report and issues a year-end payment determination, called a "Notice of Program Reimbursement" ("NPR"), as to the amount of Medicare program reimbursement due to the hospital for services furnished to Medicare patients during the fiscal year covered by the cost report. *See* 42 C.F.R. § 405.1803; *In re Medicare Reimbursement Litig.*, 309 F. Supp. 2d 89, 92 (D.D.C. 2004), *aff'd*, 414 F.3d 7 (D.C. Cir. 2005).

43.    The Medicare Administrative Contractor also makes estimated payments to hospitals on an interim basis as claims are paid throughout a cost reporting period, including DSH payments. *See* Medicare Claims Processing Manual, ch. 3, § 20.3; 42 C.F.R. § 413.64(f)(2); Medicare Fin. Mgmt. Manual, CMS Pub. 100-06, ch. 8, § 10.5, http://www.cms.gov/manuals/downloads/Fin 106c08.pdf.

44.    A hospital may appeal a Medicare Administrative Contractor's determination as to the total amount of Medicare program reimbursement due the hospital for the fiscal year covered by a cost report to the agency's Plaintiff Reimbursement Review Board ("Board"). *See* 42 U.S.C § 1395oo(a)(1)(A); 42 C.F.R. §§ 405.1835–405.1877.

45.    A hospital has the right to a hearing before the Board if it is dissatisfied with the contractor's payment determination in an NPR as to the total amount of program reimbursement due to the hospital for its cost reporting period. 42 U.S.C. § 1395oo(a)(1); *see also* 42 C.F.R §§ 405.1835; 405.1837. The statute further requires a minimum amount in controversy and that the appeal be filed timely. 42 U.S.C. § 1395oo(a)(2)–(3).

### Medicare Part C

46.    Section 4001 of the Balanced Budget Act of 1997, Pub. Law No. 105-33, added a new Part C to the Medicare statute to establish a Medicare program that was originally called the

Medicare+Choice (also known as "M+C") program and is now called Medicare Advantage. A Medicare beneficiary can elect to receive Medicare benefits either through the original fee-for service program under Medicare Parts A and B, or through enrollment in a Medicare Advantage plan under Medicare Part C. 42 U.S.C. § 1395w-21(a)(1); 42 C.F.R. § 422.50; *see also* 63 Fed. Reg. 34,968, 34,968 (June 26, 1998) ("Under section 1851(a)(1), every individual entitled to Medicare Part A and enrolled under Part B . . . may elect to receive benefits through either the existing Medicare fee-for-service program or a Part C M+C plan." (emphasis added)).

47.    "Before 2004, [Defendant's agency] had not treated Part C enrollees as 'entitled to benefits under Part A.'" *Allina II*, 863 F.3d at 939 (quoting *Northeast Hosp.*, 657 F.3d at 15); *see also Allina I*, 746 F.3d at 1106 ("Prior to 2003, the Secretary treated Part C patients as not entitled to benefits under Part A."); *Allina I*, 904 F. Supp. 2d 75, 78–80 (D.D.C. 2012); *Northeast Hosp.*, 657 F.3d at 16.

48.    That approach reflected the original 1986 DSH regulation, which limited Part-A-entitled days in the Medicare Part A/SSI fraction to patient days that were "covered," or paid, by Medicare Part A. *See* 42 C.F.R. § 412.106(b)(2)(i) (2003); 42 C.F.R. § 409.3 (defining "covered" as services for which payment is authorized). The agency said as much when adopting the pre-2004 regulation, explaining that the numerator of the Medicare Part A/SSI fraction included only "covered Medicare Part A inpatient days." 51 Fed. Reg. at 16,777 (emphasis added); *see also* 51 Fed. Reg. 31,454, 31,460–61. Although the 1986 regulation did not expressly mention Part C patient days (as noted above, Part C came later), it necessarily excluded them as days not covered and paid under Part A. *See Cath. Health Initiatives Iowa Corp. v. Sebelius,* 718 F.3d 914, 921 n.5 (D.C. Cir. 2013) (noting that the pre-2004 regulation limited the Medicare Part A/SSI fraction to "covered Medicare Part A inpatient days" (citing 51 Fed. Reg. at 16,777)). The DSH regulation

prior to 2004 necessarily excluded Part C days from Part-A-entitled days because Part C days are not covered or paid under Part A. *See* 42 U.S.C. § 1395w-21(a)(1), (i) (providing that payment of Part C benefits is in lieu of benefits otherwise payable under Part A); *see also Northeast Hosp.,* 657 F.3d at 6. The agency asserted incorrectly during the rulemaking at issue here that it was required to issue this 2023 Retroactive Rule because it had no pre-existing, relevant promulgated rule. *See* 85 Fed. Reg. 47,723, 47,725 (Aug. 6, 2020); 88 Fed. Reg. 37,772, 37,776 (June 9, 2023). To the contrary, the agency had no obligation to engage in further notice and comment because it had already established the relevant DSH payment standard calling for the exclusion of Part C days from Part-A-entitled days, embodied in the 1986 regulation, through notice-and-comment rulemaking.

49.    Further, written guidance prior to 2004 repeatedly expressed the agency's policy that Part C days, as days for which patients were not entitled to Part A payment, were to be excluded from Part-A-entitled days in the Medicare Part A/SSI fraction. *See Northeast Hosp.*, 657 F.3d at 15 (describing prior instructions not to submit information related to services furnished to Part C patients that would have been necessary to count Part C days in the Medicare Part A/SSI fraction). This guidance included instructions to hospitals and program memoranda transmitting the Medicare Part A/SSI fractions on an annual basis. *See* HCFA Pub. 60A, Transmittal No. A-98-36 (Oct. 1, 1998), reprinted in MEDICARE & MEDICAID GUIDE ("MMG") (CCH) ¶ 150,103 (transmitting Medicare Part A/SSI fractions that excluded Part C days, specifying that the fractions include only "covered Medicare days," and referring to the ratio of SSI days and "covered Medicare days" as "the ratio of Medicare Part A patient days attributable to SSI recipients"); HCFA Pub. 60A, Transmittal No. A-99-42 (Sept. 1, 1999), reprinted in MMG ¶ 150,769 (same); HCFA Pub. 60A, Transmittal No. A-00-54 (Aug. 17, 2000), reprinted in MMG ¶ 151,363 (same);

CMS Pub. 60A, Transmittal No. A-01-109 (Sept. 13, 2001), reprinted in MMG ¶ 152,216 (same);

CMS Pub. 60A, Transmittal No. A-02-086 (Sept. 11, 2002), reprinted in MMG ¶ 152,922 (same);

CMS Pub. 60A, Transmittal No. A-03-067 (Aug. 8, 2003), reprinted in MMG ¶ 153,554 (same);

CMS Pub. 100-04, Transmittal 275 (Aug. 13, 2004), reprinted in MMG ¶ 154,468 (same).

50.     In a 2003 proposed rule, the agency proposed "to clarify" its long-held position that "once a beneficiary elects Medicare Part C, those patient days attributable to the beneficiary should not be included in the Medicare fraction of the DSH patient percentage." 68 Fed. Reg. 27,154, 27,208 (May 19, 2003). The agency explained that "[t]hese days should be included in the count of total patient days in the Medicaid fraction (the denominator), and the patient's days for a [Part C] beneficiary who is also eligible for Medicaid would be included in the numerator of the Medicaid fraction." *Id.* It also explained that "once a beneficiary has elected to join [a Part C] plan, that beneficiary's benefits are no longer administered under Part A." *Id.*

51.     In a final rule published in August 2004, however, the agency engaged in a "volteface" and "abruptly announced a change in policy." *Allina I*, 746 F.3d at 1107–10; *Allina I*, 904 F. Supp. 2d at 78; *see Northeast Hosp.,* 657 F.3d at 15–16 (finding that the agency's "actual treatment of [Part C] days" as well as its "statements in the 2004 attempted rulemaking and in a subsequent 2007 technical revision confirm that [it] changed [its] interpretation of the DSH provision in 2004," and "belie[d] [its] claim that" the 2004 attempted rule merely "codified a longstanding policy"). That 2004 attempted rule announced that the agency would "adopt[] a policy" to include Part C days in the Medicare Part A/SSI fraction and exclude them from the Medicaid fraction effective October 1, 2004. 69 Fed. Reg. 48,916, 49,099 (Aug. 11, 2004); *see also Northeast Hosp.,* 657 F.3d at 16 ("[I]n the 2004 attempted rulemaking [the agency] announced that [it] was 'adopting a policy' of counting [Part C] days in the Medicare fraction.").

52.     In the 2004 rule, the agency purported to amend the regulation text by deleting the word "covered." 69 Fed. Reg. at 49,246. When the agency initially transmitted the Medicare Part A/SSI fractions for FFYs 2005 and 2006, however, those fractions continued to exclude Part C days. *See* CMS Pub. 100-04, Transmittal 1091 (Oct. 27, 2006), reprinted in MMG ¶ 156,277 (transmitting FFY 2005 Medicare Part A/SSI fractions and specifying that the fractions include only "covered Medicare days," and referring to the ratio of SSI days and "covered Medicare days" as "the ratio of Medicare Part A patient days attributable to SSI recipients"); CMS Pub. 100-04, Transmittal 1396 (Dec. 14, 2007), reprinted in MMG ¶ 156,930 (same for FFY 2006 fractions).

53.     In July 2007, the agency issued a revision to a Medicare program manual, with a "purported 'effective date' of October 1, 2006," which permitted hospitals to submit the data necessary to implement the new policy regarding Part C days. *Allina I,* 904 F. Supp. 2d at 82. That same month, the agency also issued a transmittal instructing hospitals "to submit 'no pay' bills to their Medicare contractor for the [Part C] beneficiaries they treat, in order for these days to be eventually captured in the DSH . . . calculations." CMS Pub. 100-04, Transmittal 1311 at 1 (July 20, 2007), https://www.cms.gov/regulations-and-guidance/guidance/transmittals/ downloads/r1311cp.pdf; 88 Fed. Reg. at 37,789–90 (discussing Transmittal 1311); *Northeast Hosp.*, 657 F.3d at 15 (describing this instruction as "the Secretary revers[ing] course") Thereafter, in August 2007, the agency further amended the text of the DSH regulation governing Part C days without affording hospitals prior notice or opportunity for comment. 72 Fed. Reg. 47,130, 47,384 (Aug. 22, 2007). Following the amendments in 2004 and 2007, the regulation provided that the Medicare Part A/SSI fraction includes all patient days (not just "covered" days) for "patients entitled to Medicare Part A (or Medicare Advantage (Part C))." *Id.* at 47,411 (amending §§ 412.106(b)(2)(i)(B) and (iii)(B)). The amendment of the regulation was made effective October 1,

2007, the beginning of FFY 2008. *Id.* at 47,130; *see also Allina I*, 904 F. Supp. 2d at 82. The agency further amended the regulation "in 2010 to use the word 'including' in place of 'or,' in an apparent attempt to bolster further" the agency's position on the treatment of Part C days. *Allina I,* 904 F. Supp. 2d at 82 n.5.

54.    In May 2013, while the agency's appeal from this Court's decision in *Allina I* was pending before the Court of Appeals, the agency engaged in a new rulemaking on the treatment of Part C days effective only prospectively, beginning October 1, 2013. *See* 78 Fed. Reg. 27,486, 27,578 (May 10, 2013). In that rulemaking, the agency "in an abundance of caution . . . proposed to readopt the policy of counting the days of patients enrolled in [Part C] plans in the Medicare fraction    " 78 Fed. Reg. 50,496, 50,615 (Aug. 19, 2013). Accordingly, effective as of October 1, 2013, the rule governing the DSH calculation is the same as the 2004 attempted rule had been. *See id.* at 50,619 (stating that rule "readopt[ion]" applies to "[F]FY 2014 and subsequent years" only). The agency did not claim in this rule that it had the authority to adopt the rule retroactively. *See id.* at 50,619–20.

### *Northeast Hospital*

55.    The agency's change to the DSH payment calculation, first adopted in 2004, has given rise to substantial litigation. Initially, the agency attempted to apply the 2004 rule change retroactively to cost years prior to the rule's October 1, 2004, effective date. On September 13, 2011, the Court of Appeals found that the agency's retroactive application of its current rule to periods prior to October 1, 2004, violated the Supreme Court's longstanding decision in *Bowen* because it "change[d] the legal consequences of treating low-income patients" and thus could not be applied retroactively. *See Northeast Hosp.*, 657 F.3d at 13–17. The Court held that "the Secretary's present interpretation, which marks a substantive departure from his prior practice of excluding [Part C]

days from the Medicare fraction, may not be retroactively applied" to the fiscal years at issue. *Id.* at 17. The agency did not claim in the 2004 attempted rule, *see generally* 69 Fed. Reg. 48,916, or the *Northeast Hospital* litigation, that it had retroactive rulemaking authority to make this change, *see Northeast Hosp.*, 657 F.3d at 17 ("We are aware of no statute that authorizes the Secretary to promulgate retroactive rules for DSH calculations."); Def.'s Cross-Mot. for Summ. J., *Northeast Hosp.*, 699 F. Supp. 2d 81 (D.D.C. 2010) (No. 09-0180), ECF No. 15; Def.'s Reply Mem. in Supp. of Def.'s Mot. for Summ. J., *Northeast Hosp.*, 699 F. Supp. 2d 81 (D.D.C. 2010) (No. 09-0180), ECF No. 24; Br. of Appellant, *Northeast Hosp.*, 657 F.3d 1 (D.C. Cir. 2011) (No. 10-5163); Reply Br. of Appellant, *Northeast Hosp.*, 657 F.3d 1 (D.C. Cir. 2011) (No. 10-5163).

56.    The Court also adopted the Secretary's position that the Medicare DSH statute is ambiguous and does not require any specific treatment of Part C days in the DSH calculation. *Northeast Hosp.*, 657 F.3d at 11. In particular, the Court concluded that "Congress has not clearly foreclosed the Secretary's interpretation that [Part C] enrollees are entitled to benefits under Part A," and that "[r]ather, it has left a statutory gap, and it is for the Secretary, not the court, to fill that gap." *Id.* at 13. Moreover, although the agency ultimately contended that the 2004 attempted rule "codified a longstanding policy," the Court found that its "treatment of [Part C] days prior to 2004 belie[d] [that] claim." *Id.* at 15. The record confirmed, according to the Court, that "the Secretary routinely excluded [Part C] days from the Medicare fraction," and that "she changed her interpretation of the DSH provision in 2004." *Id.* at 15–16. The Court also rejected the agency's contention that its "routine[] fail[ure] to count [Part C] patient days in the Medicare fraction prior to 2004" was a "result of data system errors." *Id.* The Court found that argument "not convincing" given the agency's pre-2004 written guidance, its contemporaneous description of the 2004 attempted rule as newly "'adopting a policy' of counting [Part C] days in the Medicare fraction,"

and its 2007 description of the 2004 attempted rule as announcing a "policy change." *Id.* Finally, the Court explained that "the practical consequences of this dispute number in the hundreds of millions of dollars." *Id.* at 5.

57.    In his concurrence, then Judge Kavanaugh found that the plain language of the statute unambiguously foreclosed the agency's interpretation because it "is sufficiently clear in establishing that a Part C beneficiary is not simultaneously entitled to benefits under Part A for any specific patient day." *Id.* at 24 (Kavanaugh, J., concurring). This is because, he explained, "entitlement" means "to have payment made," and "a Medicare patient enrolled in a Part C plan does not have the right 'to have payment made under, and subject to the limitations in, [Medicare] part A.'" *Id.* at 20. He noted that "[t]he only thing that unifies the Government's inconsistent definitions of this term is its apparent policy of paying out as little money as possible." *Id.* at 20 n.1. Like the majority, he similarly found that the agency "interpreted the statute as the Hospital does here" until 2004, when it "abruptly changed course, apparently because of an overriding desire to squeeze the amount of money paid to Medicare providers (and beneficiaries) in light of the country's increasingly precarious fiscal situation." *Id.* at 21. Judge Kavanaugh also emphasized that "this statute does not permit HHS to pursue fiscal balance on the backs of Medicare providers and beneficiaries in this way." *Id.*

58.    The agency acquiesced in the *Northeast Hosp.* decision in June 2012 through TDL-12391. TDL 12391, 06-06-12 (June 12, 2012). The transmittal provided that in light of the *Northeast Hosp.* decision, it required Medicare contractors to "include any disallowed patient days attributable to patients who were enrolled in a Medicare Part C Plan and also eligible for Medicaid for discharges occurring on or after January 1, 1999 through September 30, 2004 in the Medicaid fraction" of the DSH calculation. *Id.* at 1. The agency specified that this relief should be applied to

26

any cost reports that were not yet settled, as well as settled cost reports where the hospitals had filed proper appeals. *Id.* at 1–2.

### *Allina I*

59.      In July 2009, the agency first published Medicare Part A/SSI fractions for hospital cost reporting periods beginning in FFY 2007.1 These fractions were the first ones that ever included Part C days.

60.      In *Allina I*, the plaintiff hospital was among a group of hospitals that challenged the 2004 attempted rule change through administrative appeals initiated in 2009, arguing that (1) the new Part C days policy was not the "logical outgrowth" of the 2003 proposed rule "clarifying" the agency's former policy, and (2) the rule was arbitrary and capricious because the agency's "cursory explanation in the 2004 Final Rule" failed to acknowledge its departure from past policy[5] and practice and ignored the "financial impact" of that departure. *Allina I*, 904 F. Supp. 2d at 89, 83, 92–94.

61.      On November 15, 2012, this Court agreed and held that the policy announced in the 2004 final rule regarding Part C days was not the logical outgrowth of the 2003 proposed rule. *Id.* at 89–92. This Court also held that the "cursory explanation in the 2004 Final Rule failed to meet the requirements of the APA" because "the Secretary[] fail[ed] to acknowledge her 'aboutface'" and "her reasoning for the change was brief and unconvincing." *Id.* at 93 (quoting *Northeast Hosp.*, 657 F.3d at 15). Accordingly, this Court concluded that "[t]he portion of the 2004 Final Rule . . . that announced the Secretary's interpretation of the Medicare Disproportionate Share Hospital Fraction, as codified in 2007 at 42 C.F.R. § 412.106(b)(2) and as further modified

---

[5] The agency did not even begin to collect "all the data necessary to implement its new policy until 2007," and the FFYs 2005 and 2006 Medicare Part A/SSI fractions did not include Part C days. *Allina I*, 904 F. Supp. 2d at 82.

in 2010, will be vacated, and the case will be remanded to the Secretary for further action consistent with this Opinion." *Id.* at 95. The Court also noted that the agency's argument that its then- "current interpretation [was] entirely consistent with the past" was "clearly forestalled by *Northeast Hospital*" and was "also irregular legal gamesmanship, which wastes time and casts unfortunate doubt on counsel's credibility." *Id.* at 77–78 n.2. The Court added that "*Northeast Hospital* [did not] give room for a legally significant difference between practice and policy," and that, "[i]n fact, the appellate court went to pains to state the opposite." *Id.* at 88.

62.    On April 1, 2014, the Court of Appeals affirmed this Court's *Allina I* decision on the merits, "agree[ing] with the district court that the Secretary's final rule was not a logical outgrowth of the proposed rule." 746 F.3d at 1109. The Court similarly found that the agency's argument "that the Secretary did not previously actually include Part C days in the Medicaid fraction . . . disregards [its] holding in *Northeast Hospital*, where [it] explicitly stated that the Secretary did have a prior practice of excluding Part C days from the Medicare fraction." *Id.* at 1108. In reaching its conclusion, the Court explained that "a party reviewing the Secretary's notice of proposed rulemaking understandably would have assumed that the Secretary was proposing to 'clarify' a then-existing policy, i.e., one of excluding Part C days from the Medicare fraction and including them in the Medicaid fraction." *Id.* Because this procedural failure was a sufficient basis to vacate the rule, the Court of Appeals did not reach the arbitrariness of the agency's explanation. *Id.* at 1111.

63.    With respect to remedy, the Court of Appeals held that this Court "correctly concluded that vacatur was warranted." *Id.* The court reversed, however, a part of this Court's order that required "the Secretary to recalculate the hospitals' reimbursements 'without using the interpretation set forth in the 2004 Final Rule.'" *Id.* (quoting the Post-Judgment Order). The Court

28

of Appeals instead remanded, noting that the "question whether the Secretary could reach the same result" on remand as would have applied under the vacated rule "was not before the district court" and therefore this Court should have simply "remand[ed] after identifying the error." *Id.* at 1111.

### *Allina II*

64.     In mid-June 2014, 16 days after the Court of Appeals' mandate in *Allina I* vacating the 2004 attempted rule, the agency published Medicare Part A/SSI fractions for FFY 2012, including Part C days for all hospitals in the country. The agency proceeded without notice or comment and provided no explanation at all for its decision to include Part C days in the Medicare Part A/SSI fractions for FFY 2012 but instead issued those fractions just as it had for prior years, as if the vacatur of that rule in *Allina I* had never happened. Certain plaintiff hospitals in the *Allina I* litigation filed a separate action in this Court challenging the 2014 determination. This Court granted the agency's motion for summary judgment. *Allina II*, 201 F. Supp. 3d 94 (D.D.C. 2016), which the hospitals appealed.

65.     In 2017, the Court of Appeals unanimously reversed the District Court, agreeing with the hospitals that the agency "violated the Medicare Act by failing to provide for notice and comment" before readopting the 2004 policy. *Allina II*, 863 F.3d at 942. The Court of Appeals concluded that the Medicare Act, 42 U.S.C. § 1395hh(a)(2), required rulemaking for any "(1) 'rule, requirement, or other statement of policy' that (2) 'establishes or changes' (3) a 'substantive legal standard' that (4) governs 'payment for services,'" and that the agency's issuance of the FFY 2012 Medicare Part A/SSI fractions including Part C days satisfied each of these factors. *Id.* at 943. The Court also found that the agency violated another provision of the Medicare Act, 42 U.S.C. § 1395hh(a)(4), which provides that "if a regulation includes 'a provision that is not a logical outgrowth of a previously published notice of proposed rulemaking,' that provision may not

become legally operative until it has gone through notice-and-comment rulemaking." *Id.* at 945. The Court concluded that "[t]he statutory text says that the vacated rule may not 'take effect' at all until there has been notice and comment." *Id.*

66.    On April 27, 2018, the government filed a petition for a certiorari. *See* Pet. for Writ of Cert., *Allina II*, 587 U.S. 566 (2019) (No. 17-1484). Before providing reasons for the petition, the government recognized that "[i]t is extremely important that agencies rigorously observe applicable procedural requirements, to provide the requisite notice to regulated parties." *Id.* at 13. The government also asserted that "[t]he significant financial stakes in this particular context underscore that certiorari is warranted," highlighting that "the particular issue in this case concerning the proper interpretation of the Medicare-fraction statute alone implicates between $2 and $4 billion in reimbursement for FY2005 through FY2013." *Id.* at 23.

67.    On June 3, 2019, after granting certiorari, the Supreme Court affirmed the Court of Appeals' ruling in *Allina II* as to the notice-and-comment requirement under 42 U.S.C. § 1395hh(a)(2). *Allina II*, 587 U.S. 566. The Supreme Court held that the agency's 2014 application of the 2004 Part C days policy was "at least" a statement of policy that changed or established a substantive legal standard governing payment for services, and thus required notice and comment rulemaking under Section 1395hh(a)(2) of the Medicare statute. *Id.* at 571–80. The Court emphasized that "the public had a right to notice and comment before the government could adopt the policy at hand." *Id.* at 573 (emphasis added) (citation omitted). The Court also explained that the inclusion of Part C days in the Medicare fraction "makes the fraction smaller and reduces hospitals' payments considerably—by between $3 and $4 billion over a 9-year period, according to the government." *Id.* at 571. The Court further opined that the government "might have sought to argue," but in fact did not contend, that "the statute itself required it to count Part C patients in

the Medicare fraction" and instead "has insisted that the statute 'does not speak directly to the issue,' and thus leaves a 'gap' for the agency to fill." *Id.* at 583–84 (citations omitted). In addition, the Supreme Court did not disturb the Court of Appeals' ruling that the readopted 2004 policy is also invalid under 42 U.S.C. § 1395hh(a)(4) because the agency failed to engage in notice and comment rulemaking following the logical outgrowth failure of its vacated 2004 attempted rule before making the policy take effect, *id.* at 1816, or "legally operative," *Allina II*, 863 F.3d at 945.

68.    On September 4, 2019, this Court entered judgment in favor of the plaintiffs in *Allina II*. *See* Order, *Allina II*, No. 14-cv-1415 (D.D.C. Sept. 4, 2019), ECF No. 58. As part of its order, the District Court vacated the agency's 2014 publication of the FFY 2012 Medicare Part A/SSI fractions including Part C days. *Id.* at 2. A year later, on September 4, 2020, the plaintiffs in that case filed a motion to enforce the Court's earlier judgment. *See* Mot. Enforce J., *Allina II*, No. 14-cv-1415 (D.D.C. Sept. 4, 2020), ECF No. 60. On June 16, 2023, the *Allina II* plaintiffs filed a notice of supplemental authority notifying the Court of the agency's final action on Part C days, *see* Pls.' Notice of Suppl. Auth., *Allina II*, No. 14-cv-1415 (D.D.C. June 16, 2023), ECF No. 69, to which the government responded on June 28, 2023, *see* Def.'s Resp. to Pls.' Notice of Suppl. Auth., *Allina II*, No. 14-cv-1415 (D.D.C. June 28, 2023), ECF No. 70. On July 22, 2023, the Court denied the plaintiffs' motion to enforce judgment, concluding that the lawfulness of the agency's Part C final action "is a question for another day, and another suit." Mem. Order at 1, *Allina II*, No. 14-cv-1415 (D.D.C. July 22, 2023), ECF No. 71.

### *Allina III*

69.    While the *Allina II* litigation was underway, on December 5, 2014, the agency issued a notice that the Plaintiff Hospitals' appeal, along with the appeals from the other hospitals in the *Allina I* case, was "now before the Administrator of CMS for a determination of the

appropriate statutory interpretation in the absence of the vacated 2004 attempted rule to be used to calculate the providers' DSH payment with respect to the treatment of the Part C days for [F]FY 2007." Pls.' Mem. in Opp'n to Def.'s Mot. to Dismiss Ex. 2, at 2, *Allina III*, No. 16-cv-150 (D.D.C. May 4, 2016), ECF No. 12-2.

70.     On January 23, 2015, the plaintiff hospital, along with the other *Allina I* plaintiffs, submitted comments in response to the agency's notification of review on remand. *See* Def.'s Mot. to Dismiss Ex. 7, at 4–7, *Allina III*, No. 16-cv-150 (D.D.C. Apr. 4, 2016), ECF No. 9-7 (CMS Administrator decision summarizing the plaintiff hospitals' comments). Among other comments, the *Allina I* plaintiffs contended that the pre-2004 standard was reinstated by the vacatur of the 2004 attempted rule, *see* Providers' Comments to CMS Adm'r on Remand, *Allina* Health Servs. v. Blue Cross Blue Shield Ass'n, PRRB Case Nos. 10-0165G et al. at 18–20 (Jan. 23, 2015), and that this standard could not be altered until the agency undertook notice-and-comment rulemaking, *see id.* at 21–30. They also argued that the agency's interpretation conflicts with Congressional intent, *see id.* at 30–34, and that the agency should interpret "entitled" consistently throughout the Medicare statute, *see id.* at 34–37. The *Allina I* plaintiffs further asserted that public interest favors applying the pre-2004 standard because they made financial decisions in reliance on expected DSH payments consistent with those made under the agency's unchanged policy in the years immediately following the 2004 attempted rule, until FFY 2008 when the agency first implemented the change. *See id.* at 17, 37–43.

71.     On December 2, 2015, the agency on remand reached the same conclusion as the (vacated) 2004 final rule and issued its "final administrative decision," concluding that "days associated with Medicare patients who are enrolled in a Part C plan are to be included in the numerator and denominator of the Medicare fraction." Def.'s Mot. to Dismiss Ex. 7, at 46, *Allina*

*III*, No. 16-cv-150 (D.D.C. Apr. 4, 2016), ECF No. 9-7. The agency acknowledged, among other things, the Court of Appeals' *Northeast Hosp.* holding that "the phrase 'entitled to benefits under part A' is ambiguous." *Id.* at 24 (citation omitted).

72.     On January 29, 2016, the plaintiff hospital here along with the other *Allina I* plaintiffs initiated *Allina III* by filing a complaint within 60 days of the agency's remand decision to challenge that "final administrative decision" on remand. *See* Compl., *Allina III*, No. 16-cv- 150 (D.D.C. Jan. 29, 2016).

73.     On April 4, 2016, the government filed a partial motion to dismiss, alleging that *Allina I* only concerned the treatment of Part C days in the SSI fraction, and that the *Allina III* plaintiffs should be estopped from expanding their case to address both fractions. *See* Def.'s Mot. to Dismiss, *Allina III*, No. 16-cv-150 (D.D.C. Apr. 4, 2016), ECF No. 9.

74.     On August 4, 2017, the Court issued an opinion denying the government's motion to dismiss. *See* Order, *Allina III*, No. 16-cv-150 (D.D.C. Aug. 4, 2017), ECF No. 16. The Court concluded that it had jurisdiction to hear the hospitals' challenge to the calculation of both fractions, citing the *Allina I* language that "the statute unambiguously requires that Part C days be counted in one fraction or the other." *Id.* at 17 (quoting *Allina I*, 746 F.3d at 1108 (emphasis omitted)). The Court also concluded that the hospitals were not judicially estopped from pursuing the Medicaid fraction challenge. *Id.* at 26.

75.     Subsequently, the parties jointly agreed to stay briefing on the merits pending a final decision in *Allina II*, *see* Joint Status Report, *Allina III*, No. 16-cv-150 (D.D.C. Aug. 16, 2017), ECF No. 18, and the Court stayed the case, *see* Minute Order, *Allina III*, No. 16-cv-150 (D.D.C. Aug. 17, 2017).

76.     On July 11, 2019, the *Allina III* plaintiffs filed a motion for judgment after the Supreme Court's decision in *Allina II*. *See* Pls.' Mot. for J., *Allina III*, No. 16-cv-150 (D.D.C. July 11, 2019), ECF No. 26. On July 25, 2019, the government opposed this motion and cross-moved for a remand to the agency to consider the implications on the case of the Supreme Court's decision. *See* Def.'s Response to Pls.' Mot. for J., *Allina III*, No. 16-cv-150 (D.D.C. July 25, 2019), ECF No. 27.

77.     On October 25, 2019, the Court issued a decision denying the motion for judgment and granting the government's motion for a remand to the agency. *See* Order, *Allina III*, No. 16-cv-150 (D.D.C. Oct. 25, 2019), ECF No. 34. The Court remanded the challenge to the CMS Administrator decision at issue without vacating it. *Id.*; *see* Order at 2, *Allina III*, No. 16-cv-150 (D.D.C. Jan. 2, 2020), ECF No. 40 (clarifying that the October 2019 order "should not have referred to vacatur"); Order, *Allina III*, No. 16-cv-150 (D.D.C. Jan. 2, 2020), ECF No. 41 (amended October 2019 order).

### **Subsequent Rulemaking and Implementing Instructions**

78.     On August 6, 2020, nearly 16 years after CMS originally promulgated the now vacated 2004 final rule, the agency published in the Federal Register a notice of proposed rulemaking announcing a proposal to adopt retroactively for periods prior to October 1, 2013 (and even prior to the vacated 2004 attempted rule) the same Part C policy change as that previously adopted in the publications vacated in *Allina I and Allina II*. 85 Fed. Reg. 47,723.

79.     The proposed rule claimed incorrectly that, due to the vacatur of the 2004 attempted rule, the agency has no rule governing the treatment of Part C days and must, under the Supreme Court's opinion in *Allina II* requiring notice-and-comment rulemaking, engage in retroactive

rulemaking. *Id.* at 47,724–25. The proposed rule, however, ignored the pre-2004 attempted rule as well as the policy and practice reinstated by the 2004 attempted rule's vacatur. *Id.* at 47,725.

80.    The proposed rule claimed two grounds for its use of retroactive rulemaking: first, it claimed that retroactive rulemaking is necessary to establish a standard to comply with the statutory requirement to calculate Medicare DSH payments, and second, it claimed that retroactive rulemaking is in the "public interest" because, absent retroactive rulemaking, the agency "would be unable to calculate and confirm proper DSH payments for the time periods before [F]FY 2014." 85 Fed. Reg. at 47,725. As the agency has consistently argued in the litigation challenging the validity of its attempts to change its policy on Part C days in the DSH calculation, the agency did not assert in the proposed rule that the DSH statute was unambiguous as to Part C days and acknowledged the Court of Appeals holding that the term "entitled to benefits" under Part A in the DSH statute is ambiguous. *See* 85 Fed. Reg. at 47,725 (acknowledging that, in *Northeast Hosp.*, "[t]he Court of Appeals . . . held that the Medicare statute does not speak directly to how Part C days should be treated for purposes of DSH calculations"); Def.'s Mot. for Summ. J. at 3, 10–11, 14, 44, *Allina I*, 904 F. Supp. 2d 75 (D.D.C. 2012) (No. 10-1463), ECF No. 35; Def.'s Reply Mem. in Supp. of Mot. for Summ. J. at 7, *Allina I*, 904 F. Supp. 2d 75 (D.D.C. 2012) (No. 10-1463), ECF No. 40; Br. for Appellant Kathleen Sebelius at 10, *Allina I*, 746 F.3d 1102 (D.C. Cir. 2014) (No. 13-5011); Final Br. for Appellant Kathleen Sebelius at 10, 22, *Allina I*, 746 F.3d 1102 (D.C. Cir. 2014) (No. 13-5011); Final Reply Br. for Appellant Kathleen Sebelius at 23, *Allina I*, 746 F.3d 1102 (D.C. Cir. 2014) (No. 13-5011); Def.'s Mot. for Summ. J. at 9–10, 19, 21, 23, *Allina II*, 201 F. Supp. 3d 94 (D.D.C. 2016) (No. 14-1415), ECF No. 29; Reply Mem. of Points & Authorities in Support of Def.'s Mot. for Summ. J. at 9, 11, *Allina II*, 201 F. Supp. 3d 94 (D.D.C. 2016) (No. 14-1415), ECF No. 33; Br. for Appellee Thomas E. Price, M.D. at 19, *Allina II*, 863 F.3d 937 (D.C.

Cir. 2017) (No. 16-5255); Final Br. for Appellee Thomas E. Price, M.D. at 10, *Allina II*, 863 F.3d 937 (D.C. Cir. 2017) (No. 16-5255); Reply Br. for Pet'r 5 n.3, *Allina II*, 587 U.S. 566 (2019) (No. 17-1484); Def.'s Reply in Supp. of Mot. for Voluntary Remand 8, *Allina II*, 2020 WL 7042869 (D.D.C. Jan. 2, 2020) (No. 16-0150), ECF. No. 32; Def.'s Mot. for Leave to File Sur-Reply to Pls.' Mot. for Summ. J. 7–8, Fla. Health Scis. Ctr. v. Becerra, 2021 WL 2823104 (D.D.C. July 7, 2021). The agency notably did not address in the proposed rule the Ninth Circuit's decision in *Empire Health* Foundation for Valley Hospital Medical Center v. Azar, which on May 2, 2020, found substantively invalid the agency's 2005 rule regarding the counting of patient days in the Medicare fraction of individuals who were eligible for Medicare Part A and Medicaid but not entitled to have payment made for such days under the Medicare Part A payment system. 958 F.3d 873, 884–86 (9th Cir. 2020), rev'd and remanded sub nom. Becerra v. *Empire Health* Found., for Valley Hosp. Med. Ctr., 597 U.S. 424 (2022).

81.     On June 9, 2023, the agency issued its "final action" on remand in the form of the 2023 Retroactive Rule. *See* 88 Fed. Reg. at 37,786. CMS finalized its proposal to adopt retroactively for all periods prior to October 1, 2013, the same Medicare DSH payment standard change on Part C days in the DSH calculation reflected in the prior publications vacated in *Allina I* and *Allina II*, *see id*. at 37,790, as well as the prospective-only 2013 rule, *see id.* at 37,792 ("[I]n this final action we are adopting the same policy of including [Part C] patient days in the Medicare fraction that was prospectively adopted in the FY 2014 IPPS final rule and applying this policy retroactively to any cost reports that remain open for cost reporting periods starting before October 1, 2013."). The agency newly claimed—inconsistent with the proposed rule—that its interpretation of the DSH statute as to Part C days is statutorily required following the Supreme Court's decision on a different category of days in *Empire Health*. *See id.* at 37,775. The agency also asserted, in the

alternative, that its retroactive rulemaking is necessary and proper to comply with the Supreme Court's decision in *Allina II* and "to establish" the Part C standard for cost years before October 1, 2013. *Id.* at 37,776; *see* 88 Fed. Reg. at 37,772 ("This final action establishes a policy       ") *id.* at 37,774 ("[I]t is necessary for CMS to engage in retroactive rulemaking to establish a policy . . . ."); *id.* at 37,783 ("If rulemaking was required to change the Secretary's approach, as held in *Allina II*, then rulemaking was also required to establish the Secretary's approach in the first place."). The agency also justified such retroactive rulemaking by suggesting that the action (1) was needed to cover the "avowed statutory gap" following Empire, *id.* at 37,781, and (2) served the public interest by "avoid[ing] the consequences of ambiguity" in DSH payment calculations, *id.* at 37,790. Moreover, the agency claimed both that "Medicare DSH payments have already been made under the policy reflected in the proposal," *id.,* and that this rule was needed "to avoid the consequences of legal ambiguity" because CMS otherwise "would be unable to calculate and confirm proper DSH payments for time periods before [F]FY 2014," *id.* at 37,775. With respect to the financial impact, the agency stated that this rule "does not have any additional costs or benefits relative to the Medicare DSH payments that have already been made," *id.* at 37,772, including for "small rural hospitals," *id.* at 37,793. CMS also claimed that while "[i]t is not clear what to compare an estimate of DSH payments [to] under [the] final policy," the agency "estimate[s] [that] the change in Medicare DSH payments to hospitals as a result of the policy finalized in this action based on a range of potential expenditures" is "$0–$0.6 billion." *Id.* Following this final agency action in the final rule, plaintiff hospital here once again joined the other *Allina* hospitals to challenge the rule for their cost years beginning in 2007.2 *See* Compl., *Allina* Health Sys. v. Becerra, No. 1:23-cv-02144 (D.D.C. July 24, 2023) ("*Allina IV*"), ECF No. 1.

82.     On February 1, 2024, CMS published instructions to Medicare contractors to implement the 2023 Retroactive Rule. *See* Change Request (CR) to Implement the Medicare Program Final Action: Treatment of Medicare Part C Days in the Calculation of a Hospital's Medicare Disproportionate Patient Percentage, CMS Manual System, Pub. 100-20, Transmittal 12513, CR 13294 (Feb. 1, 2024), https://www.cms.gov/files/document/r12513otn.pdf (hereinafter "CR 13294"). Among other things, CMS instructed Medicare contractors to issue revised NPRs for appeals of pre-October 1, 2013, cost reporting periods that have been remanded pending the resolution of *Allina II*. *Id.*

## FACTS SPECIFIC TO THIS CASE AND THE PROCEDURAL POSTURE

83.     Under these instructions, the Allina hospital plaintiff received a revised NPR dated May 29, 2024 for its cost reporting period ending December 31, 2009. The Medicare Administrative Contractor had issued the original NPR for the hospital's 2006 cost year on November 13, 2017. The Montefiore hospital challenged the 2004 final DSH Part C days rule in an appeal from its original NPR on May 10, 2018, and requested expedited judicial review in that appeal with respect to the continued application of the Part C days policy reflected in the vacated 2004 attempted rule, which was granted on June 26, 2018. Other hospitals subsequently filed a complaint in the U.S. District Court for the District of Columbia in Florida Health Sciences Ctr. v. Azar, No. 17-cv-1751, and the court consolidated that case into a consolidated action comprised of cases presenting similar challenges, In re: *Allina II*-Type DSH Adjustment Cases. *See* Mem. Order at 8, Florida Health Sciences Ctr. v. Azar, No. 17-cv-1751 (D.D.C. Nov. 4, 2019), ECF No. 36. On January 19, 2021, the court granted the Secretary's motion to remand the consolidated cases, including Plaintiff Hospitals' FY 2006 appeal, to the agency for further action in light of the

Supreme Court's ruling in *Allina II*. Mem. Order at 1, In re: *Allina II*-Type DSH Adjustment Cases, No. 19-mc-190 (D.D.C. Jan. 19, 2021), ECF No. 74. In a June 16, 2023, order, the CMS Administrator further remanded the appeal of the original NPR to the Office of Financial Management with instructions to the Medicare Administrative Contractors to apply the Part C final rule. CMS, Order of the Administrator, 19-cv-0290 (June 16, 2023).

84.    Following the publication of CMS's February 2024 instructions for implementing the Final Rule discussed above, the Medicare Administrative Contractor issues a revised NPR for each of the above referenced Plaintiff Hospitals' specific years. Each accompanying audit adjustment states that it "implement[s] the June 9, 2023, Final Rule (88 FR 37772) regarding the Treatment of Medicare Part C days in the Calculation of a Hospital's Medicare Disproportionate Patient Percentage" and the cover letter to the revised NPR stated that it "calculated" payment. The impact of this issue for each such hospital cost year is substantial, reflecting the estimated increase to Plaintiff Hospitals' DSH payment if Medicare Part C days were properly excluded from the SSI fraction and Medicaid eligible days for Part C patients were included in the Medicaid fraction numerator for the cost year at issue.

85.    Each Plaintiff hospital timely challenged the revised NPR implementing the final action in the 2023 final rule by filing an appeal to the Board, expressing its dissatisfaction with the revised NPR for its cost reporting period ending December 31, 2006, which applied the retroactive final rule adopted to include Part C days as Part-A-entitled days in the Provider's DSH payment. Plaintiff Hospitals thereafter requested expedited judicial review regarding the validity of the rule.

86.    The Board granted Plaintiff Hospitals' request for EJR in this matter, *See* Exhibit B. In its letter, the Board found that it had jurisdiction to hear the Plaintiff Hospitals' appeal. The Board concluded that it had jurisdiction over the matter for "the question of the validity of the

DSH Part C Days policy as adopted in the June 2023 Final Rule" and granted Plaintiff Hospitals' EJR request because the Board "is without the authority to decide the legal question of whether the DSH Part C Days policy, as adopted on a retroactive basis in the June 2023 Final Rule, is substantively or procedurally valid." *Id.*, at 11.

87.     By the filing of this Complaint, the plaintiff hospital has properly commenced this action for judicial review under 42 U.S.C. § 1395oo(f)(1).

## ASSIGNMENT OF ERRORS

88.     The Medicare statute provides for judicial review of the questions presented here "pursuant to the applicable provisions under chapter 7 of title 5," i.e., the APA. 42 U.S.C. § 1395oo(f)(l).

89.     The applicable provisions of the APA provide that the "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; [or] (E) unsupported by substantial evidence." 5 U.S.C. § 706(2). Under this standard, the 2023 Retroactive Rule is invalid, and should be set aside, because the agency's readoption of the Part C policy first published in the 2004 attempted rule that the plaintiff hospital already challenged before the agency and succeeded in getting vacated and then readopted prospectively in the 2013 rule during the course of the *Allina* litigation is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, in excess of statutory authority, without observance of procedure required by law, and unsupported by substantial evidence, including for (but not limited to) the reasons more specifically described below.

**Count I: The 2023 Retroactive Rule Should Be Set Aside as Contrary to Law and Required Procedure, and In Excess of Statutory Authority**

90.    The plaintiff hospital repeats the allegations in paragraphs 1–89 of this Complaint as if fully set forth herein.

91.    The 2023 Retroactive Rule also is another example of the finding of this Court in *Allina I* that the agency was engaging in "irregular legal gamesmanship, which wastes time and casts unfortunate doubt on counsel's credibility." 904 F. Supp. 2d at 77–78 n.2.

92.    The exclusion of Part C days from the numerator of the Medicaid fraction for any patients discharged prior to October 1, 2004, also contradicts the Court of Appeals' decision in *Northeast Hosp.*, which found that the agency could not retroactively apply the 2004 policy change to periods prior to the October 1, 2004, effective date of that rule. 657 F.3d at 16–17. The agency's attempt to apply this policy again through the 2023 Retroactive Rule runs directly afoul of the *Northeast Hosp.* decision. As with the 2004 attempted rule, the agency continues to ignore *Northeast Hosp.* and to deny the change in policy that it established. *See* 88 Fed. Reg. 37,783 ("recogniz[ing] that . . . *Northeast* stated . . . that the agency had a pre-[F]FY 2005 'practice' of excluding Part C days from the Medicare fraction").

93.    The final action also violates the language and intent and has exceeded the authority of 42 U.S.C. § 1395hh(e). Neither of the narrow exceptions permitting "retroactivity of substantive changes" applies, and the agency itself in the recent rulemaking purports to "establish" a policy rather than "change" its policy on Part C days. *See* 42 U.S.C. § 1395hh(e)(1)(A); *see* 88 Fed. Reg. at 37,772, 37,774, 37,776, 37,783.

94.    The first narrow "required by statute" exception cannot be met here because the Court of Appeals has expressly adopted Defendants' prior position that the DSH statute is

ambiguous, and the statute does not require any specific treatment of Part C days in the DSH calculation. *See Northeast Hosp.*, 657 F.3d at 11. *See Allina I*, 746 F.3d at 1106 ("[T]he phrase 'entitled to benefits under Part A' is ambiguous." (citation omitted)). The government has consistently taken that position. *See, e.g.,* Def.'s Mot. for Summ. J. at 3, 10–11, 14, 44, *Allina I*, 904 F. Supp. 2d 75 (D.D.C. 2012) (No. 10- 1463), ECF No. 35; Def.'s Mot. for Summ. J. at 9–10, 19, 21, 23, *Allina II*, 201 F. Supp. 3d 94 (D.D.C. 2016) (No. 14-1415); supra ¶ 62. The agency did not assert in the proposed rule that the statute unambiguously required its interpretation. *See* 85 Fed. Reg. 47,725 but rather acknowledged the Court of Appeals' holding that the term "entitled to benefits" under Part A in the DSH statute is ambiguous and not clearly requiring one interpretation or another as to calculating Part C days. *See* 85 Fed. Reg. 47,725.

95.     In fact, not even the members of the United States Supreme Court agree on the meaning of the statute, in a quintessential reflection of ambiguity.   As Justice Kavanaugh correctly wrote in his dissent in *Empire Health*, "this case is resolved by the most fundamental principle of statutory interpretation: Read the statute." (emphasis added.) His analysis continues that the statute makes clear the opposite meaning given by the majority in the same opinion.  Kavanaugh implores: "Zero in on the phrases "entitlement to have payment made" and "for such days,"  to understand that Part C days are not properly counted as days for which patients are "entitled" to Medicare Part A.  As Justice Kavanaugh wrote in dissent in *Empire Health*:  "A patient was not entitled to have payment made by Medicare "for such days" in the hospital if the patient by statute could not (and thus did not) have payment made by Medicare for those days—for example, because private insurance was already covering the patient's care, or the patient had exhausted his Medicare benefits.  Both statutory text and common sense point to that conclusion.  HHS's contrary interpretation boils down to the proposition that a patient can be simultaneously entitled and

disentitled to have payment made by Medicare for a particular day in the hospital. That interpretation does not work. And HHS's misreading of the statute has significant real-world effects: It financially harms hospitals that serve low-income patients, thereby hamstringing those hospitals' ability to provide needed care to low-income communities."

96.    Plaintiff hospital contends that the Part C days policy reflected in the 2023 Retroactive Rule is contrary to the plain language of the Medicare DSH statute. *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I)–(II); *Northeast Hosp.*, 657 F.3d at 24 (Kavanaugh, J., concurring) (finding that the plain language of the statute unambiguously foreclosed the agency's interpretation because it "is sufficiently clear in establishing that a Part C beneficiary is not simultaneously entitled to benefits under Part A for any specific patient day").

97.    The agency's new reliance on *Empire Health* to suggest that the DSH statute requires its interpretation is misguided. First, the Court did not decide whether patients who have opted out of the Part A fee-for-service program to elect Part C coverage are still entitled to Part A—a fact that the agency concedes. *See* 88 Fed. Reg. 37,774 ("*Empire* did not address specifically whether Part C enrollees remain 'entitled to Part A'" (citation omitted)). Second, the Court in *Empire Health* notably did not decide under *Chevron* whether (or that) the agency's interpretation was unambiguously required by statute. Instead, the Supreme Court "approve[d]" the agency's new interpretation of "entitled to benefits under part A" of Medicare as applied to the counting of inpatient hospital days for a different category of patients, "patients whom Medicare insures but does not pay for on a given day" in the Medicare DSH payment calculation. 597 U.S. at 428 (emphasis added). After describing the DSH statute as "a lot to digest," "a mouthful (and without the brackets, it's even worse)," and "technical," *id.* at 430–31, 434, the Court found that the "[t]ext, context, and structure all support calculating the Medicare fraction HHS's way," which reflects the

"best" reading. *Id.* at 445 (emphases added). Nor was the question presented in the government's certiorari petition whether the statute unambiguously required its interpretation. *See* Pet. for Writ of Cert. at I, *Empire Health*, 597 U.S. 424 (2022) (No. 20-1312) (identifying the question presented as "[w]hether the Secretary has permissibly included in a hospital's Medicare fraction all of the hospital's patient days of individuals who satisfy the requirements to be entitled to Medicare Part A benefits, regardless of whether Medicare paid the hospital for those particular days" (emphasis added)).

98.   Reading *Empire Health* as requiring the agency to include Part C days as Part-A-entitled days would contravene the Supreme Court's decision in *National Cable & Telecommunications Association v. Brand X Internet Service*, which observed that only a *Chevron* "step one" holding that there is an unambiguous statute could "displace[] a conflicting agency construction." 545 U.S. 967, 983 (2005). Moreover, in that case, the Supreme Court distinguished between "the best reading of the statute" (as the Court found in *Empire Health*), on the one hand, and an interpretation that "the statute unambiguously forecloses" and "contains no gap for the agency to fill," on the other hand. *Id.* at 983–84, 986.

99.   The second limited exception is not met here because the 2023 Retroactive Rule cannot be said to be in public interest. Among other reasons, it offends fundamental notions of justice and disregards the significant public interest in advance notice-and-comment rulemaking, especially where, as here, the agency has suffered defeat three times in the Court of Appeals and the Supreme Court over its policy change and, instead of paying safety-net hospitals what they are owed, unfairly seeks to readopt that same policy retroactively almost two decades after the agency first attempted to adopt the same change in its 2004 attempted rule and nearly a decade after readopting the same standard in a prospective-only 2013 rule. *See, e.g., Bowen*, 488 U.S. at 225

44

(Scalia, J., concurring) (permitting "curative" rulemaking "would 'make a mockery . . . of the APA,' since 'agencies would be free to violate the rulemaking requirements of the APA with impunity if, upon invalidation of a rule, they were free to "reissue" that rule on a retroactive basis'" (citation omitted)). The 2023 Retroactive Rule also results in thousands of safety-net hospitals losing billions of dollars in funding that has been illegally withheld for years. Indeed, the agency had historically recognized the limited nature of this public interest exception. For example, CMS has adopted the public interest exception to correct technical errors made in a prior rulemaking, *see, e.g.,* 69 Fed. Reg. at 78,717; 70 Fed. Reg. at 16,729; 70 Fed. Reg. at 52,025; 70 Fed. Reg. at 76,176; 70 Fed. Reg. at 76,197; 72 Fed. Reg. at 18,913. CMS also invoked this exception in responding to a natural disaster when, following the Hurricane Katrina disaster in the Gulf Coast area, CMS retroactively change the graduate medical education ("GME") full-time equivalent rules to account for displaced residents forced to train at hospitals outside disaster zones, as well as to ensure consistent GME funding for hospitals within the disaster zone to ease hardship on hospitals caused by the hurricane. *See* 71 Fed. Reg. at 18,663. And as explained further below, the public interest counsels against applying the readopted policy from the vacated 2004 attempted rule in the 2023 Retroactive Rule because hospitals nationwide, including the plaintiff hospital, made financial decisions relying on DSH payments being consistent with the pre-2004 standard before the issuance of the 2007 SSI fractions in 2009 and following the 2012 vacatur of the rule in 2004 for periods prior to October 1, 2013. Finally, the 2023 Retroactive Rule conflicts with the legislative history of Section 1395hh(e), which confirms that Congress enacted this provision in 2003 to expressly limit CMS's power to continue engaging in retroactive rulemaking, not expand it. *See* H.R. Rep. No. 108-391, at 42 (2003) (Conf. Rep.) (enacting 1395hh(e)(1) to "ensure that Medicare's rules are not generally applied retroactively" (emphasis added)).

100.    The final action also otherwise violates 42 U.S.C. § 1395hh(e)(1)(A). The agency claims to be "establish[ing]" a standard on Part C days. *See, e.g.,* 88 Fed. Reg. at 37,772 ("This final action establishes a policy[.]"); *id.* at 37,774 ("[I]t is necessary for CMS to engage in retroactive rulemaking to establish a policy[.]"); *id.* at 37,776 ("[T]he decision in *Allina II* would require notice-and-comment rulemaking to establish the gap-filling policy stated in this action."); *id.* at 37,783 ("If rulemaking was required to change the Secretary's approach, as held in *Allina II*, then rulemaking was also required to establish the Secretary's approach in the first place."). However, if that were the case, then the agency could not do so retroactively because Section 1395hh(e)(1)(A) of the Medicare statute permits retroactive rulemaking only to "change" a substantive standard, not to "establish" one. *See* 42 U.S.C. § 1395hh(e)(1)(A).

101.    To the extent that there were any ambiguity concerning whether the agency had the authority to engage in retroactive rulemaking under 42 U.S.C. § 1395hh(e) (and there is no such ambiguity) following *Northeast Hosp.* and the subsequent vacatur of the 2004 attempted rule in *Allina I*, any such ambiguity must be read against retroactivity. *See Landgraf*, 511 U.S. at 273 (explaining that the presumption against retroactivity does "no[t] conflict" with the principle that "a court should 'apply the law in effect at the time it renders its decision' . . . when the statute in question is unambiguous" (citation omitted) (emphasis added*)); I.N.S. v. St. Cyr*, 533 U.S. 289, 320 (2001) (discussing the "the presumption against retroactive application of ambiguous statutory provisions" (emphasis added)); *Coal. for Common Sense in Gov't Procurement* v. U.S., 707 F.3d 311, 318 (D.C. Cir. 2013) ("As the Supreme Court has instructed, a 'statute may not be applied retroactively . . . absent a clear indication from Congress that it intended such a result.'" (quoting St. Cyr, 533 U.S. at 316)). Indeed, well-established case law disfavors retroactivity and provides for a "presumption against retroactivity." *Landgraf*, 511 U.S. at 245 (emphasis added). The

Supreme Court has explained that "[r]etroactivity is not favored in the law. . . [such that] a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules." *Bowen*, 488 U.S. at 208. The Court has expressed that "[t]he presumption against statutory retroactivity is founded upon elementary consideration of fairness dictating that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *Landgraf,* 511 U.S. at 245.

102.    The final action similarly violates the Medicare statute and implementing regulations, which preclude untimely reopening and revision of a claim payment determination. *See* 42 U.S.C. § 1395gg(c); 42 C.F.R. § 405.980(b). The Medicare statute specifically states that, absent a showing of fault, the agency may not recoup an alleged overpayment from a hospital more than five years after an initial payment determination was made. *See* 42 U.S.C. § 1395gg(c). Here, no such fault has been, or can be, established. The agency thus cannot recoup such funds from the plaintiff hospital that it paid under the pre-2004 standard. *See* Medicare Claims Processing Manual, ch. 3, § 20.3 ("[T]he [contractor] will identify hospitals that are eligible to receive the DSH adjustment and make interim payments subject to a year-end settlement based upon the hospital's DSH percentage for the cost reporting period."); 42 C.F.R. § 413.64(f)(2).

103.    The rule also violates *Allina II* and is procedurally invalid under 42 U.S.C. § 1395hh(a). The Medicare Act provides that if a final rule is not a logical outgrowth of a proposed rule, then it "shall not take effect" until there is further opportunity for comment and publication again as a final rule. 42 U.S.C. § 1395hh(a)(4). After finding a logical outgrowth failure in *Allina I*, 746 F.3d at 1109, the Court of Appeals in *Allina II* concluded that the agency violated 42 U.S.C. § 1395hh(a)(4) by not providing a "further opportunity for public comment and a publication of the [2004] provision again as a final regulation" before reimposing or making "legally operative"

the 2004 attempted rule vacated for a logical outgrowth failure, 863 F.3d at 945. The Court held that the agency could not bypass the notice-and-comment requirements of the Medicare Act by claiming to proceed through adjudication, 863 F.3d at 945, which is an inherently retroactive process, *see Bowen*, 488 U.S. at 221 (Scalia, J., concurring) ("Adjudication deals with what the law was; rulemaking deals with what the law will be."). This means that the agency is barred from effectuating or applying the same policy change at least until after the effective date of a legally sound notice-and-comment process adopting the rule prospectively only. If the agency were allowed to proceed with the 2023 Retroactive Rule, it would render meaningless Section 1395hh(a)(4), as the agency could always circumvent the statute's advance notice-and-comment requirement by reimplementing the rule retroactive to the date of the initial rule that created the logical outgrowth problem in the first place. But such rulemaking, as Justice Scalia opined in *Bowen*, "would 'make a mockery . . . of the APA,' since 'agencies would be free to violate the rulemaking requirements of the APA with impunity if, upon invalidation of a rule, they were free to 'reissue' that rule on a retroactive basis." 488 U.S. at 225 (Scalia, J., concurring).

104.    The rule further violates *Allina II* and is procedurally invalid under 42 U.S.C. § 1395hh(a)(2). The Medicare Act requires notice-and-comment rulemaking for a "rule," a "requirement" or a "statement of policy" that "establishes or changes a substantive legal standard governing . . . the payment for services." 42 U.S.C. § 1395hh(a)(2). In *Allina II*, the Supreme Court upheld the Court of Appeals' finding that agency "violated" the rulemaking provisions of the Medicare Act under 42 U.S.C. § 1395hh(a)(2) by failing to provide for notice and comment. 587 U.S. at 571–79. The Court determined that the agency's attempted readoption of the 2004 policy was at least a statement of policy that changed or established a substantive legal standard governing payment for services, and thus required notice and comment under Section 1395hh(a)(2). *Id.* The

Supreme Court emphasized that "the public had a right to notice and comment before the government could adopt the policy at hand." *Id.* at 573 (citation omitted and emphasis added). As with Section 1395hh(a)(4), the 2023 Retroactive Rule cannot "take effect" before substantive changes affecting the legal rights and obligations of providers take effect. 42 U.S.C. § 1395hh(a)(2).

105.   Retroactivity of the 2023 Retroactive Rule is improper under the law, in that it is not necessary to comply with any statute and its lack of retroactivity would "not be contrary to the public interest." 42 U.S.C. § 1395hh(e)(1)(A). Indeed, the 2023 Retroactive Rule deprives hospitals who serve low-income patients of much needed reimbursement and has resulted in deep cuts and closures of many hospitals around the country. The APA generally prohibits retroactive application of new, retroactive rules on past actions because retroactivity alters the consequences to Plaintiffs after the fact.

106.   Retroactivity of the new 2023 Retroactive Rule exceeds the agency's rulemaking authority under the Medicare statute. The span of many years of retroactivity encompassed in the 2023 Retroactive Rule is per se unreasonable, arbitrary, capricious, and contrary to the spirit and policy of the rulemaking authority under the APA which governs Medicare.

107.   The new 2023 Retroactive Rule is arbitrary and capricious, and fails any test of reasoned decision-making, especially because so much time has passed and because other hospitals' claims have been paid on the basis of Part C Days being calculated in the numerator of the Medicaid Fraction instead of the denominator of the Medicare/SSI Fraction.

108.   *Becerra v. Empire Health Foundation, For Valley Hospital Medical Center*, 597 U. S. 424 (2022) ("*Empire Health*") is distinguishable, wrongly decided and should not pertain to this issue.

109.    2023 Retroactive Rule is not in accordance with the statutory language shown in Section 1886(d)(5)(F) of the Social Security Act ("the Act") (42 U.S.C. 1395ww(d)(5)(F)).  Under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), Courts should assess de novo whether an agency's 2023 Retroactive Rule is consistent with the underlying statute. The Plaintiffs challenge the requirement of including M+A, HMO or Part C Days in the Medicare/SSI fraction, asserting that it deviates from the statutory meaning, purpose and intent.

110.    Although CMS has argued that such rulings are "merely interpretive," even if published on the Federal Register, CMS has been told more than once by courts that it could not change positions like this from a former policy to something new, without formal notice-and-comment rulemaking.  *See, e.g., Northeast Hosp.* 657 F.3d 1 (invalidating previous attempt at implementing a rule retroactively, without notice-and-comment rulemaking, that changed previous course and included Medicare Part C Days in the Medicare Fraction denominator).  The *Northeast Hosp.* decision held that such calculation cannot be used for 2004 and prior—which, by the way, the government has ignored.

111.    HHS must subject even interpretive policies to notice-and-comment formal rulemaking if those policies establish or change a substantive legal standard governing reimbursement: "it is apparent that the Secretary's decision to apply her present interpretation of the DSH statute to fiscal years 1999-2002 violates the rule against rulemaking. The Secretary's interpretation, as set forth in the 2004 attempted rulemaking and resulting amendment to § 412.106, contradicts her former practice of excluding M+C days from the Medicare fraction. Moreover, the amendment attaches new legal consequences to hospitals' treatment of low-income patients during the relevant time period." *Northeast Hosp., supra*.

112.    The Supreme Court made formal rulemaking an unequivocal bright line in 2019 in *Allina II*. In *Azar vv. Allina Health Services*, 139 S. Ct. 1804 (June 3, 2019) ("*Allina*"), the Supreme Court's 7-1 decision decisively held that the distinct notice-and-comment language Congress used in the Medicare statute could not be read as incorporating the APA's exception to notice-and-comment requirements for "interpretative Retroactive Rules," i.e., Retroactive Rules that merely interpret an existing statutory requirement and do not themselves create binding law.

113.    CMS's payment of DSH reimbursement has been unreasonably delayed and should have been made long ago.  DSH reimbursement for Plaintiffs' year in this appeal should be made in accordance with policies existing prior to 2004 and including payment of attorney fees and interest for all the years of delay, as provided in 42 U.S.C. § 1395oo(f)(2);

114.    CMS has indicated in several rulings and to at least three Federal Courts that DSH reimbursement was going to be made in accordance with *Northeast Hosp.* 657 F.3d 1; <u>CMS is estopped to change course now and deny such payments</u>.  Similarly, CMS made DSH reimbursement prior to 2004 based on covered days, not total days, and there can be no change of course without (or until after) formal rulemaking and issuance of a rule consistent with the statute, neither of which has occurred with the 2023 Retroactive Rule.

115.    Previously, Plaintiffs have been paid DSH for years 2004 and prior without M+A, HMO or Part C Days in the Medicare fraction and there is no reason for different treatment.  If and to the extent now implemented, 2023 Retroactive Rule will create a situation where similarly-situated parties are treated dissimilarly, which is an arbitrary and capricious agency action.

116.    Administration of these claims, as required by *Allina I, Northeast Hospital*, and *Allina II*, has been long and unreasonably delayed since 2010. The conduct of the Medicare agency has been entirely disingenuous, including violating or ignoring altogether valid legal authority and

precedent.  Also, as *to Allina III* and the *Allina II Type cases--* cases that were brought to enforce *Allina I* and *Allina II--* the agency obtained "voluntary remand" by statements to the courts—borne out over time to be false—that the agency was going to "give the plaintiff [hospitals] the victory they seek," which the Medicare agency clearly did not intend to do but must now do.

117.    CMS took the position that, unless and until CMS issued new or revised Notice of Program Reimbursement ("RNPR's") for all the claims that had been previously remanded to await this new rule, appellants had no right to object or seek remedy from the courts.  Under this argument, the Secretary controlled when or even if these particular claimants can pursue administrative remedies.  This is and was violative of the APA, and sound legal principles including due process rights.

118.    Also, the RNPRs were unreasonably delayed and should have been issued years earlier.  The so-called "Hold" and the delay in administration was years in the making.  Moreover, while the 2023 Retroactive Rule indicated that instructions will be provided to the Medicare Administrative Contractors ("MAC") for publishing such RNPRs, none were forthcoming for more than a year even though the 2023 Retroactive Rule was published June 9, 2023.  CMS has given no explanation for the delay in publishing the instructions to the MAC for publishing of such RNPRs.

119.    The 2023 Retroactive Rule should be rejected because it disregards *Allina I*, *Northeast Hosp.*, and *Allina II*, is otherwise contrary to law, exceeds the agency's rulemaking authority under the Medicare statute, and is arbitrary and capricious for failing any test of reasoned decision-making.

120.    Among other infirmities, the 2023 Retroactive Rule misconstrues the legal effect of the vacatur of the 2004 attempted rule in *Allina I*, 746 F.3d at 1105, which restored the pre-2004

52

DSH Part C standard. By excluding Part C days from the numerator of the Medicaid fraction for any patients discharged prior to October 1, 2004, and by disclaiming any pre-2004 policy or practice treating Part C days as not Part-A-entitled days, the agency also again disregards *Northeast Hosp.*, 657 F.3d at 16–17.

121.    In addition, the 2023 Retroactive Rule violates 42 U.S.C. § 1395hh(e) because neither of the narrow exceptions for rulemaking applies here given that (1) the ambiguous DSH statute does  not require any specific treatment of Part C days in the DSH calculation, *see Allina I*, 746 F.3d at 1106; *Northeast Hosp.*, 657 F.3d at 13, and the DSH statute does not require a 2023 Retroactive Rule for the agency to comply with its obligation to make payments; and (2) the 2023 Retroactive Rule cannot be said to be in the public interest, given that it offends fundamental notions of justice, disregards the significant public interest in *advance* notice-and-comment rulemaking, and results in thousands of safety-net hospitals losing billions of dollars in funding that has been illegally withheld for years. Nor can the agency retroactively "establish," rather than "change," the Part C DSH standard under the plain language of the Medicare statute.  *See* 42 U.S.C. § 1395hh(e)(1)(A).

122.    Even if there were any ambiguity as to whether the agency had the authority to engage in this rulemaking under Section 1395hh(e) (and the agency clearly lacks that authority), any such ambiguity would need to be read against retroactivity, given the well-established presumption in law against retroactivity.

123.    The 2023 Retroactive Rule conflicts with other provisions of the Medicare statute prohibiting action against Plaintiffs with respect to noncompliance with its substantive change and precluding untimely reopening and revisions of claims payment determinations. *See* 42 U.S.C. §§ 1395hh(e)(1)(C), 1395gg(c).

124.     In addition, the 2023 Retroactive Rule violates *Allina II* and is procedurally invalid under 42 U.S.C. § 1395hh(a)(4), which bars the agency from effectuating or applying the same policy change from the 2023 Retroactive Rule vacated in *Allina I* as a logical outgrowth failure, 746 F.3d at 1105, at least until *after* the effective date of a legally sound notice-and-comment process adopting the 2023 Retroactive Rule prospectively only, *see Allina II*, 863 F.3d at 945; *Allina II*, 587 U.S. at 581–84.

125.     The 2023 Retroactive Rule further violates *Allina II* and is procedurally invalid under 42 U.S.C. § 1395hh(a)(2) because the agency again seeks to make the change "take effect" *before* affording impacted Plaintiffs the requisite notice and comment. *See* 42 U.S.C. § 1395hh(a)(2); *Allina II*, 587 U.S. at 571–80.

126.     Once again, through the 2023 Retroactive Rule, the agency continues to deny a 2004 change in policy and practice and made one last-ditch effort to accomplish the same change in yet another substantively and procedurally improper fashion. It must be set aside to stop the agency's repeated circumvention of the law.

127.     The 2023 Retroactive Rule is improper under the law and violates the rulings in all the court cases that have been decided up to this point on this issue.  Inclusion of Medicare Part C patient days in the Medicare Fraction Denominator was held to be impermissible for fiscal years prior to 2014 in *Allina I*, 746 F.3d 1102; *Northeast Hosp.*, 657 F.3d 1; *Allina II*, 587 U.S. 566; and *Allina III*, No. 16-cv-150 (D.D.C. Jan. 29, 2016) , 139 S. Ct. 1804 (2019) ("*Allina II*"), all of which held that the prior policy and practice of the Secretary—which was NOT to include Medicare Part C days in the denominator of the Medicare/SSI Fraction—could not be changed before proper rulemaking and the effective date of rules like the 2023 Retroactive Rule.

128. The 2023 Retroactive Rule is contrary to the principals and practices of the Medicare agency for many years and cannot be changed by making a new rule "retroactive" to cover years when there was a different established practice in place.

129. Nearly 19 years after it originally promulgated the 2004 final Retroactive Rule vacated in *Allina I* and nine years since its still-intact remand decision in *Allina I*, the agency in 2023 issued the Retroactive Rule purporting to readopt retroactively the change from the still-vacated 2004 Retroactive Rule previously readopted prospectively in 2013. The Plaintiffs once again seek, and the law demands, an end to the twenty-year long machinations of the Secretary to avoid, or at least unreasonably delay, payment calculated as courts have held to be required.

130. Patients enrolled under a Part C plan receive their benefits under Part C of the Medicare statute, not Part A. *See* 42 U.S.C. §§ 1395w-21–1395w-29. Therefore, these patients are not "entitled" to benefits under Part A, and CMS should not have added Part C days either to the numerator or the denominator of the Medicare/SSI fraction. Instead, days attributable to Medicaid-eligible patients enrolled in a Part C managed care plan should be included in the Medicaid percentage of the Medicare DSH calculation.

131. Indeed, prior to 2004, CMS did not include Part C days in the Medicare/SSI fraction. *Northeast Hosp.*, 657 F.3d at 17. In 2004, CMS purported to establish a policy to include Part C days in the Medicare/SSI fraction. 69 Fed. Reg. 48,916, 49,099 (Aug. 11, 2004). That regulation was promulgated in violation of the APA, 5 U.S.C. § 553(b)–(c), and is invalid. *Allina Health Servs. v. Sebelius*, No. 1:10-cv-01463-RMC (D.D.C. Nov. 15, 2012). Accordingly, CMS's 2004 interpretation, as codified at 42 C.F.R. § 412.106(b)(2), may not be applied to the Plaintiff.

132. These types of days include Medicare Advantage, Medicare Managed Care, Medicare+Choice and/or Part C Days (Collectively "MA") days. The key legal issue to be

55

determined is whether dual eligible MA patients are "entitled to benefits under Part A" If the answer to this question is in the affirmative, then these patient days should be included in the Medicare fraction. On the other hand, if these patients are not entitled to benefits under Part A, the hospital days associated with these patients should be included in the Medicaid fraction.

133.    It is clear from the statute that MA patients are not "entitled to benefits under Part A." Under the Medicare statute, "entitlement of an individual to [Medicare part A] benefits for a month shall consist of entitlement to have payment made under, and subject to the limitations in, [Medicare] part A… on his behalf for [certain] services." *See* 42 U.S.C. § 426(c)(1). A person may only enroll in a MA plan if he is entitled to benefits under Medicare Part A. *See* 42 U.S.C. § 1395w-21(a)(3)(A). However, upon enrollment in a MA plan, an individual is no longer "entitle[d] to have payments made under, and subject to the limitations in, [Medicare] part A" Rather, "payments under a contract with Medicare+Choice organization…with respect to an individual electing a Medicare+Choice plan offered by the organization shall be ***instead*** of the amounts which (in the absence of the contract) would otherwise be payable under [Medicare] parts A and B." *See* 42 U.S.C. § 1395w21(i)(1) (emphasis added). *See also* 42 U.S.C. § 1395w-21(a)(1) ("Each [MA] eligible individual . . . is entitled to receive benefits . . . (A) through the original Medicare fee-for-service program under parts A and B . . . , **or** (B) through enrollment in a Medicare+Choice plan under [MA]." (Emphasis added)).

134.    The use of the language **"*instead*"** and **"*or*"** in the statute clearly indicates that a patient is entitled to benefits under a MA plan or Part A, but not both. Thus, a patient receiving benefits under an MA plan is not also entitled to benefits under Part A. Accordingly, the plain language of the statute requires that MA patients be excluded from the Medicare fraction and included in the Medicaid fraction.

135.    Furthermore, a MA patient who may be entitled to benefits which are in excess of the Part A benefit limitations cannot at the same time receive benefits "subject to the limitation in, [Medicare] part A." *See* 42 U.S.C. § 426(c)(1). Part A coverage is available for each day of inpatient hospital care up to a maximum of 150 days in any single "spell of illness." The first 60 days are fully paid, subject only to an initial deductible, and the next 30 days are subject to a coinsurance amount. Days 91 through 150 are lifetime reserve days, which may only be used once, and are subject to a coinsurance amount double the coinsurance amount for days 61 through 90.

136.    However, MA patients may be entitled to benefits which are in excess of these limitations. For example, certain MA plans are required to provide for a catastrophic limit on beneficiary out-of-pocket expenditures for both in network and out of network benefits. *See* 42 C.F.R § 422.101(d). Similarly, MA patients may also be entitled to the provision of health benefits or services beyond the required Part A and Part B coverage. *See* 42 C.F.R. § 417.440(a)(4)(ii). We note in this regard that MA plans often do not impose any limitation upon the number of covered inpatient hospitalization days. Therefore, these MA patients cannot be covered under Part A if they are not also subject to Part A's statutory benefit limitations. In sum, the benefit structure for MA patients largely negates the applicability of the Part A benefit limitations. Rather, as MA patients may be entitled to benefits which are excess of the Medicare Part A benefit limitations, these patients should not be viewed as being entitled to benefits under Part A.

137.    Moreover, applying the interpretation reached in *Jewish Hospital, Inc. v. Secretary of Health & Human Services,* 19 F.3d 270 (6th Cir. 1994), the term "entitled to benefits under Part A" would refer to the right to a payment under Part A. However the statutory language states that MA patients are paid under Part C instead of Part A. *See e.g* 42 U.S.C. § 1395w-

23(a)(1)(A) ("[T]he Secretary shall make monthly payments under this section in advance to each Medicare+Choice organization, *with respect to coverage of an individual under this part* [i.e., part C]    " (Emphasis added).

138.    In addition, as the D.C. Court of Appeals ruled in *Northeast Hosp.*, MA days must be included in the Medicaid fraction for periods prior to October 1, 2004. And as the D.C. District Court ruled in *Allina*, MA days should be included in the Medicaid fraction for periods after October 1, 2004, which would include the fiscal year under appeal, and the 2004 rule was procedurally defective for retroactivity and, therefore, infirm *ab initio*. Accordingly, MA days are not days for which patients are "entitled to benefits under Part A." As a result, these days should be included in the Plaintiffs' Medicaid fractions.

### Count II: The Final Rule Should Be Set Aside as Arbitrary and Capricious

139.    The plaintiff hospital repeats the allegations in paragraphs 1–138 of this Complaint as if fully set forth herein.

140.    In addition to being inconsistent with law and exceeding the agency's statutory authority, the final action is both arbitrary and capricious as well as unreasonable. First, the agency has still not acknowledged that the 2023 Retroactive Rule adopts the vacated 2004 rule, which was vacated and later readopted only prospectively in 2013 during the *Allina* litigation, and has offered no good reason for departing from the preexisting rule and practice regarding the treatment of Part C days in the DSH payment. *See FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009); *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089–90 (D.C. Cir. 2009) (observing that an agency must "acknowledge and provide an adequate explanation for its departure from established precedent").

141. CMS claims that "[t]his final action establish[es] a policy." 88 Fed. Reg. at 37,772; *see id.* at 37,774 ("[I]t is necessary for CMS to engage in retroactive rulemaking to establish a policy[.]"); *id.* at 37,776 ("[T]he decision in *Allina II* would require notice-and-comment rulemaking to establish the gap-filling policy stated in this action."); *id.* at 37,783 ("If rulemaking was required to change the Secretary's approach, as held in *Allina II*, then rulemaking was also required to establish the Secretary's approach in the first place."). As found by the Court of Appeals and this Court, history proves otherwise. *See, e.g., Northeast Hosp.*, 657 F.3d at 16 ("confirm[ing] that [the Secretary] changed her interpretation of the DSH provision in 2004"); *Allina I*, 904 F. Supp. 2d at 79 ("After implementation of [Part C], 'between 1999 and 2004, the Secretary routinely excluded M+C [inpatient hospital] days from the Medicare [SSI] fraction.'" (citation omitted)). Before 2004, CMS excluded Part C days from Part-A-entitled days because Part C days are not covered or paid under Part A. *See Allina II*, 863 F.3d at 939 ("Before 2004, [Defendant's agency] had not treated Part C enrollees as 'entitled to benefits under Part A.'" (quoting *Northeast Hosp.*, 657 F.3d at 15)); *Allina I*, 746 F.3d at 1106 ("Prior to 2003, the Secretary treated Part C patients as not entitled to benefits under Part A.").

142. Since 2004, the agency has tried to change that position, but courts have blocked each of its unlawful attempts to do so for cost years before 2013. These court failures mean that, following the vacatur of the 2004 attempted rule, CMS has never effectively or lawfully departed from its pre-2004 policy for cost years prior to 2013. When a rule is vacated, that vacatur has the effect of reinstating the prior regulation. *See, e.g., United Steel v. Mine Safety & Health Administration,* 925 F.3d 1279, 1287 (D.C. Cir. 2019) (concluding that the effect of vacatur was to "automatically resurrect[]" the prior standard because the new rule "modifie[d]" a pre-existing standard); *Virgin Islands Tel. Corp. v. FCC*, 444 F.3d 666, 672 (D.C. Cir. 2006) (vacatur "restored

the status quo ante."); *CropLife America v. EPA,* 329 F.3d 876 (D.C. Cir. 2003) (vacating rule and holding that "[a]s a consequence, the agency's previous practice . . . is reinstated and remains in effect unless and until it is replaced by a lawfully promulgated regulation" (emphasis added)); *Action on Smoking & Health v. Civil Aeronautics Board*, 713 F.2d 795, 797 (D.C. Cir. 1983) ("[B]y vacating or rescinding the re[s]cissions . . . the judgment of this court had the effect of reinstating the rules previously in force . . . ." (citations omitted)); *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009) (explaining that vacating a rule "[r]einstated" the prior rule "until the agency repromulgated the same rule").

143.    And under the status quo ante, the agency did not consider Part C days to be Part-A-entitled. *See Allina II*, 863 F.3d at 939 ("Before 2004, [Defendant's agency] had not treated Part C enrollees as 'entitled to benefits under Part A.'" (citation omitted)); *Allina I*, 746 F.3d at 1106 ("Prior to 2003, the Secretary treated Part C patients as not entitled to benefits under Part A."); *Northeast Hosp.*, 657 F.3d at 16 ("confirm[ing] that [the Secretary] changed her interpretation of the DSH provision in 2004"). The pre-2004 regulation, which was restored by the Court's vacatur in *Allina I*, dictates the exclusion of Part C days from the number of Part-A Case entitled days in the Medicare DSH calculation. That pre-2004 regulation specifies that the Medicare Part A/SS fraction includes only "covered" patient days, *see* 42 C.F.R. §§ 412.106(b)(2)(i) (2003), meaning days paid under Part A. *Id.* § 409.3; *see also Catholic Health Initiatives,* 718 F.3d at 921 n.5. Part C days are not covered by Part A because payment by private Part C Medicare Advantage plans for services furnished to their Part C patients is not payment by Part A. *See* 42 U.S.C. § 1395w-21(a)(1); *Northeast Hosp.*, 657 F.3d at 6. Because this rule codifies a policy of counting Part C days for years prior to 2013 (the opposite of the pre-2004 policy), the agency has "depart[ed] from

[its] prior policy sub-silentio," that is, without "display[ing] awareness that it is changing position." *Fox*, 556 U.S. at 515. The rule is, therefore, arbitrary and capricious.

144. The agency's about-face for periods before October 1, 2004, is also arbitrary and capricious because the agency has failed to explain its departure from its prior practice of acquiescing in the *Northeast Hosp.* decision and settling hundreds and hundreds of cases by instructing its contractors to include Part C days in the numerator of the Medicaid fraction. This disparate treatment is particularly unfair to the plaintiff hospital, which has not even had a chance to initiate appeals because the overdue NPRs have been delayed for a significant period of time. The lack of explanation for this differential treatment renders the 2023 Retroactive Rule arbitrary and capricious. *See Transactive Corp. v. United States*, 91 F.3d 232, 239 (D.C. Cir. 1996) (finding agency action arbitrary when it treats seemingly similar situations differently without explanation of the factual differences justifying dissimilar treatment).

145. The final rule is also arbitrary and capricious because the agency changed its pre-2004 position without properly considering reliance interests. When an agency is "'not writing on a blank slate,'" rational decision-making requires an agency "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020) (citations omitted); *Mirror Lake Vill., LLC v. Wolf*, 971 F.3d 373, 376 (D.C. Cir. 2020) (explaining that agency action is arbitrary and capricious if it is "not 'reasonably explained'" (citation omitted)). CMS violated this legal duty. It failed adequately to consider and to weigh financial reliance interests against the considerations that animated its policy. It dedicated a mere three sentences of its 2023 Retroactive Rule to financial reliance interests—one stating that no hospitals commented that they made financial decisions in reliance on the prior policy, another saying that

reliance would be unreasonable, and a final one repeating the fiction that the rule does not reflect a change in agency policy. 88 Fed. Reg. at 37,785–88. But there were, in fact, numerous comments, stating that "DSH hospitals across the country relied on the agency making DSH payments in accordance with [prior policy]." Christopher Panczner, System Senior Vice President & Chief Legal Officer at Montefiore Medical Center, Comments on Proposed Rule "Medicare Program; Treatment of Medicare Part C Days in the Calculation of a Hospital's Medicare Disproportionate Patient Percentage" (CMS-1739-P) at 4 (Oct. 2, 2020), https://www.regulations.gov/comment/CMS-2020-0089-0050; *see also* Brian Vamstad, Manager of Regulatory Affairs and Payment Policy at Allina Health, Comments on Proposed Rule "Medicare Program; Treatment of Medicare Part C Days in the Calculation of a Hospital's Medicare Disproportionate Patient Percentage" (CMS-1739-P) at 4 (Oct. 5, 2020), https://www.regulations.gov/comment/CMS-2020-0089-0053; John Mallia, Executive Vice President and Finance/CFO of Maimonides Medical Center, Comments on Proposed Rule "Medicare Program; Treatment of Medicare Part C Days in the Calculation of a Hospital's Medicare Disproportionate Patient Percentage" (CMS-1739-P) at 4 (Oct. 5, 2020), https://www.regulations.gov/comment/CMS-2020-0089-0091 (same); Robert Nesselbush, EVP and Chief Financial Officer of Kaleida Health, Comments on Proposed Rule "Medicare Program; Treatment of Medicare Part C Days in the Calculation of a Hospital's Medicare Disproportionate Patient Percentage" (CMS-1739-P) at 4 (Sept. 29, 2020), https://www.regulations.gov/comment/CMS-2020-0089-0013 (same); Karen Kim, Vice President – Appeal Services of Toyon Associates, Inc., Comments on Proposed Rule "Medicare Program; Treatment of Medicare Part C Days in the Calculation of a Hospital's Medicare Disproportionate Patient Percentage" (CMS-1739-P) at 4 (Oct. 2, 2020),

https://www.regulations.gov/comment/CMS-2020-0089-0040 (same); Michael Newell, President of Southwest Consulting Associates, Comments on Proposed Rule "Medicare Program; Treatment of Medicare Part C Days in the Calculation of a Hospital's Medicare Disproportionate Patient Percentage" (CMS-1739-P) at 7 (Oct. 1, 2020), https://www.regulations.gov/comment/CMS-2020-0089-0025 (similar); Stephanie Webster, Partner at Ropes & Gray LLP, Comments on Proposed Rule "Medicare Program; Treatment of Medicare Part C Days in the Calculation of Hospital's Medicare Disproportionate Patient Percentage" (CMS-1739-P) at 14 (Oct. 5, 2020), https://www.regulations.gov/comment/CMS-2020-0089-0092 (similar).

146.    The hospitals in the *Allina* litigation raised similar arguments in their January 2015 comments in response to the Administrator's notification of review on remand, asserting that they relied on the unamended pre-2004 regulation and continuation of the agency's pre-existing policy. *See* Providers' Comments to CMS Adm'r on Remand, *Allina Health Servs. v. Blue Cross Blue Shield Ass'n*, PRRB Case Nos. 10-0165G et al. at 39 (Jan. 23, 2015). More specifically, those comments explained that they reasonably forecasted their DSH funding based on the continuation of the pre-2004 standard and had no reason to project a reduction in such funding because CMS did not (1) actually adopt its change to the regulation in 2004 despite announcing its intent to adopt an abrupt policy reversal on Part C days; (2) issue SSI fractions treating Part C days as Part A days for FFYs 2005 and 2006; and (3) provide hospitals with accurate information concerning how that policy change would affect DSH payments once implemented. *See id.* at 37–43.

147.    In any event, even if there were no such comments, CMS would still need to consider these financial reliance interests. *See Regents of the Univ. of Cal.*, 591 U.S. at 8 (striking down rescission of government program for failure to consider reliance interests, even where the recission process did not involve an opportunity for notice and comment). CMS also entirely failed

to mention non-financial reliance interests in its 2023 Retroactive Rule. Because reliance interests in the pre- 2004 policy are "legally cognizable," the agency had a duty to consider these reliance interests\ even if, in the agency's view, its prior pre-2004 policy did not reflect the best reading of the statute. *See id.* at 29-33 (holding that DHS needed to consider reliance interests even in a program it was rescinding because, in DHS's view, it lacked a legal basis). "[W]here the agency has failed to provide even [a] minimal level of analysis [regarding reliance interests], its action is arbitrary and capricious and . . . cannot carry the force of law." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). Instead, an agency must provide a "reasoned explication for a regulation that is inconsistent with the Department's longstanding earlier position." *Id.* at 224. The agency's failure to respond adequately to such comments raising reliance interests, among other issues, is also arbitrary and capricious. *See Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 211–12 (D.C. Cir. 2011) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency . . . respond to relevant and significant comments." (internal quotation marks omitted)); *Reytblatt v. U.S. Nuclear Regul. Comm'n,* 105 F.3d 715, 722 (D.C. Cir. 1997) (explaining that agencies "must respond in a reasoned manner to [comments] that raise significant problems"); *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020) ("Nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decision making."), vacated and remanded on other grounds sub nom. *Becerra v. Gresham*, 142 S. Ct. 1665 (2022).

148.    The agency has still failed to acknowledge and justify the enormous adverse financial impact on hospitals of the Part C days policy in the 2023 Retroactive Rule. CMS does not, and cannot, reconcile its assessment of the financial impact here as between "$0" and "$0.6 billion," 88 Fed. Reg. at 37,793, when it previously represented to the Supreme Court in seeking

certiorari in *Allina II* that the impact with respect to the SSI fraction "alone implicates between $3 and $4 billion in reimbursement for FY2005 through FY2013," Pet. for Writ of Cert. at 14, *Allina II,* 587 U.S. 566 (2019) (No. 17-1484); *see Allina II*, 587 U.S. at 571 (observing that the inclusion of Part C days in the Medicare fraction "makes the fraction smaller and reduces hospitals' payments considerably—by between $3 and $4 billion over a 9-year period, according to the government"). Nor has the agency adequately explained why the policy change is appropriate despite the adverse impact on the nation's safety-net hospitals, like the plaintiff hospital, that shoulder the financial burden of treating a disproportionate share of low-income patients. The agency also asserts that "[i]t is not clear what to compare an estimate of DSH payments under [the] final policy." 88 Fed. Reg. at 37,793. But by now, nearly 20 years after the agency first adopted the vacated policy that it seeks to readopt retroactively in this 2023 Retroactive Rule and over ten years after that policy was first vacated in *Allina I* and then readopted prospectively in 2013 during that litigation, CMS has had more than enough time to do what is necessary with data at its disposal to calculate the effect of the Part C days issue accurately, particularly since the agency has been on notice since the 2012 district court decision in *Allina I* that its policy was invalid and the pre-2004 policy reinstated. If DSH payments made under the proposed rule would not differ from historical DSH payments, that is purely because CMS has erroneously continued to make payments to hospitals under its unlawful policy even after that policy was vacated twice. And given that "Medicare DSH payments have already been made under the policy reflected in the proposal," *id.* at 37,790, the agency should have been able to determine accurately the financial impact of the 2023 Retroactive Rule on hospitals. The rule is, therefore, arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (agency action is arbitrary and capricious where agency has "entirely failed to consider an important aspect of the

65

problem"); *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148–49 (D.C. Cir. 2011) (vacating a Securities and Exchange Commission rule as arbitrary and capricious because the agency had failed "adequately to assess the economic effects of a new rule" by, among other things, "inconsistently and opportunistically fram[ing] the costs and benefits of the rule" and "fail[ing] adequately to quantify the certain costs or to explain why those costs could not be quantified").

149.    The agency's policy treating Part C days as Part A days is also contrary to the intent of Congress in enacting the DSH statute and fails even the previously applicable reasonableness test under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837 (1984). Its interpretation conflicts with the purpose of the DSH adjustment, which is to provide additional payments under the Part A prospective payment system for hospitals that incur higher costs in treating low-income patients who receive their benefits and coverage under Part A. *See* H.R. Rep. No. 99-241(I), at 15 reprinted in 1986 U.S.C.C.A.N. 579, 593–94; *see also Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994) (observing that the court will not accept an agency's policy judgments "if they seem wholly unsupported or if they conflict with the policy judgments that undergird the statutory scheme"). The policy reflected in the 2023 Retroactive Rule thus "conflict[s] with the policy judgments that undergird the statutory scheme," Health Ins. Ass'n, 23 F.3d at 416, and is impermissible, *see Goldstein v. SEC*, 451 F.3d 873, 883 (D.C. Cir. 2006) (rejecting policy under *Chevron* step two where it was not "rational when viewed in light of the policy goals underlying the" applicable statute); *Coal Emp't Project v. Dole*, 889 F.2d 1127, 1137–38 (D.C. Cir. 1989) (holding that "[w]ithout further explanation, we are forced to conclude that this regulatory failure runs so contrary to a principal purpose of the Mine Act as to render MSHA's regulation unreasonable").

150. In addition, the 2023 Retroactive Rule violates the requirements of the Regulatory Flexibility Act ("RFA"), which requires agencies to assess the negative impact of their rules on small businesses, including hospitals, *see* 5 U.S.C. §§ 604, 605(a)-(b). The agency claims in the rule that "the DSH payments . . . will not differ from historical payments for years after [F]FY 2005 for most hospitals," 88 Fed. Reg. at 37,790–92, and fails to conduct adequately a regulatory flexibility analysis, *see U.S. Telecom Ass'n v. FCC*, 400 F.3d 29 (D.C. Cir. 2005) (holding that the FCC violated the RFA by issuing a rule without a regulatory flexibility analysis and staying enforcement of the rule against small entities pending further regulatory analysis on remand).

151. The 2023 Retroactive Rule is also arbitrary and capricious for failing to consider and address *Empire Health* in the proposed rule while relying on it heavily in the final rule. The agency did not even mention *Empire Health* litigation in its proposed rule, *see* 85 Fed. Reg. 47,723, despite the Ninth Circuit having ruled against the agency in May 2020, *see Empire Health*, 958 F.3d at 878. The agency's pattern is clear: it omitted *Empire Health* from the proposed rule when it was losing that case, and then introduced the case as a central rationale for its 2023 Retroactive Rule once it won the case. By ignoring this purportedly crucial case in its proposed rule, CMS engaged in arbitrary and capricious agency action. *See Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 430 (D.C. Cir. 2018) ("An agency's failure to consider an important aspect of the problem is one of the hallmarks of arbitrary and capricious reasoning.").

152. The agency's continued application of the 2004 policy is also arbitrary and capricious because the agency has failed to provide a rational explanation for its inconsistent interpretation of the same phrase "entitled to benefits" within a single sentence of the DSH statute. *See Transactive Corp.,* 91 F.3d at 237 ("A long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations

differently."). With respect to the Part C days at issue here, the agency interprets "entitled to benefits" under Part A of Medicare to include all Medicare beneficiaries who have ever once met Medicare Part A eligibility requirements, regardless of whether they are entitled to payment of Part A benefits, while at the same time the agency construes that same phrase concerning SSI benefits to include only those days for patients who were entitled to have SSI benefits paid to them on those days. *See* 78 Fed. Reg. at 50,617; *see also Baystate Med. Ctr. v. Leavitt,* 545 F. Supp. 2d 20, 26 n.12, 42 (D.D.C. 2008).

153.    Finally, the 2023 Retroactive Rule is arbitrary and capricious because it is downright irrational and internally inconsistent. For example, on one hand, the agency claims that "if there is a gap in the statute to fill, the Secretary would be unable to calculate and confirm proper DSH payments for time periods before [F]FY 2014, which would be contrary to the public interest of providing additional payments to hospitals that serve a significantly disproportionate number of low-income patients, as expressed in the DSH provisions of the Medicare statute." 88 Fed. Reg. at 37,775. But on the other hand, the agency states (incorrectly) that "Medicare DSH payments have already been made under the policy reflected in the proposal." *Id.* at 37,790. The rule cannot be required to fill a statutory gap "to avoid the consequences of legal ambiguity," *id.*, regarding payments if the agency has, in fact, already made those payments.

## **REQUEST FOR RELIEF**

154.    The plaintiff hospital requests an Order:

a)  declaring invalid and setting aside the agency's final action published in the Federal Register on June 9, 2023 (88 Fed. Reg. 37,772);

b)  declaring invalid and setting aside the final payment determinations reflecting the policy of including Part C days in the Medicare Part A/SSI

fraction and excluding Medicaid-eligible Part C patient days from the numerator of the Medicaid fraction used to calculate the Plaintiff Hospitals' Medicare DSH calculation for the cost reporting period at issue;

c) declaring invalid and setting aside the Medicare Part A/SSI fractions issued by the agency and applied in the final payment determination at issue here;

d) directing the agency to recalculate the Plaintiff Hospitals' DSH payments by applying the pre-2004 policy and practice excluding Part C days from the SSI fraction and including Medicaid-eligible Part C patient days in the numerator of the Medicaid fraction and to make prompt payment of any additional amounts due the plaintiff hospital, plus interest calculated in accordance with 42 U.S.C. § 1395oo(f)(2);

e) requiring the agency to pay legal fees and cost of suit incurred by the Plaintiff Hospitals; and

f) providing such other relief as the Court may consider appropriate.

Dated: May 13, 2026

By: _____ */s/Roya Vasseghi* _____
Roya Vasseghi (DC Bar No. 1014058)
Toby Latham (D.D.C Bar No. VA185)
roya@vasseghilaw.com
toby@vasseghilaw.com
**VASSEGHI LAW GROUP**
9663-D Main Street Fairfax,
Virginia 22031
Telephone: (703) 215-9358
Facsimile: (703) 563-7401

*Attorneys for Plaintiffs*

Ellen K. Wolf (CA Bar No. 110686)
Christopher J. Cummiskey (SBN 244249)

69

ewolf@wolfwallenstein.com
ccummiskey@wolfwallenstein.com
**WOLF WALLENSTEIN, PC**
11400 West Olympic Boulevard,
Suite 700 Los Angeles, California 90064
Telephone: (310) 622-1000
Facsimile: (310) 457-9087

*Pro Hac Vice Admission Pending*